James McCARTHER and Richard Smith, Plaintiffs,

v.

CAMELOT INN OF LITTLE ROCK, Defendant,

Rick Presley, Intervenor.

No. LR–76–C–195.

United States District Court,
E. D. Arkansas, W. D.

March 27, 1980.

Prather Randle, John W. Walker, John W. Walker, P. A., Little Rock, Ark., for plaintiff and intervenor.

James W. Moore, Tucker Raney Mathis, Friday, Eldredge & Clark, Little Rock, Ark., for defendant.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

On January 10, 1980, the Court heard evidence relating to the plaintiffs' motion to certify a class of those blacks who were discriminated against in discharge, layoff, assignment, promotion, and rate of pay in employment at the Camelot Inn, a subsidiary of the Kin-Ark Corporation. (Claims of discrimination against applicants were withdrawn by the plaintiff at the hearing.) The only question before the Court at this time is whether the named plaintiffs demonstrated the propriety of their representation of a class under the provisions of Rule 23 of the Federal Rules of Civil Procedure. It is settled that the plaintiff has the burden of showing that he meets the requirements of Rule 23, *Doctor v. Seaboard Coastline Railway Co.*, 540 F.2d 699 (4th Cir. 1976). In the Eighth Circuit it is also clear that the requirements of Rule 23 are to be liberally construed in Title VII

cases. *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1061–62 (8th Cir. 1975). *See also, Reed v. Arlington Hotel Co.*, 476 F.2d 721 (8th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970).

■ Briefly, the plaintiff must show that the class is so numerous as to make joinder impracticable, that there are common questions of law and fact, that the claims and defenses of the representative parties are typical of those of the class, and that the representative parties will adequately protect class interests. Additionally, one of the requirements of Rule 23(b) must be met. *Sperry Rand Corp. v. Larson*, 554 F.2d 868, 874–75 (8th Cir. 1977).[1] In this case, declaratory and injunctive relief are sought, among other things, for alleged employment discrimination. Thus the claim falls within 23(b)(2) which provides:

(b) *Class Action Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied and in addition:

(2) the party opposing the class has acted or refused to act on ground generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

The situations of the named plaintiffs and the plaintiff-intervenor are so different that each must be viewed separately when considering whether any of them may serve as representative of any class.

Richard Smith, a named plaintiff, is a black, former hourly employee of the Camelot Inn. He was discharged from his position as bellman. He claimed that he suffered discrimination in initial assignment, promotion, and discharge. His adequacy as a class representative is seriously in issue. It is true that he is represented by able counsel. But it does not appear that he will vigorously or adequately protect the interests of other class members since he clearly has not looked after his own interest in this litigation. He did not appear at the hearings on class certification, nor did he provide supplementary answers to interrogatories, as he had stated that he would and as this Court had ordered him to do.

Rick Presley, plaintiff-intervenor, is a black, former hourly employee of the Camelot Inn, discharged from his job as bellman-van driver. He did not answer interrogatories as directed by this Court nor did he appear to advocate the interests of the class he wishes to represent. His inadequacy as a class representative is clear.

■ For failure to comply with the Orders of this Court and for failure to prosecute their own claims, Mr. Smith and Mr. Presley will not be certified as class representatives. Furthermore, the defendant's motion to dismiss their claims will be granted pursuant to Rule 37(b)(2)(C), inasmuch as their failure to comply with the discovery orders of this Court was insufficiently justified.

James McCarther, a named plaintiff who is black, appeared and testified at the class certification hearing. He was hired as a purchasing clerk in June, 1974. In December, 1974, he informally applied for a pro-

---

1. It must be assumed that those who drafted Rule 23 intended that each requirement listed have some different meaning or connotation than was embraced in the other requirements. Some courts, however, have not so interpreted that rule. But others, now more consistent with *Rodriguez*, have required that there be a demonstration that the purported class representative meets each of the separate criteria. For example, typicality has been regarded as a separate test for the maintenance of a class action. *See, e. g., Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir. 1975); *Peterson v. Bender Co.*, 15 F.E.P. 602 (N.D.Cal.1977); *Nguyen v. Kissinger*, 21 Fed.R.Serv.2d 528 (N.D. Cal.1976); *White v. Gates Rubber Co.*, 53 F.R.D. 412 (D.Colo.1971). Federal courts have refused to certify a class on the basis of inadequacy. *See, e. g., Campbell v. Al Thrasher Lumber Co.*, 13 F.E.P. 189 (N.D.Cal.1973); *Social Services Union v. County*, 12 F.E.P. 570 (N.D.Cal.1975); *Burns v. Georgia*, 15 F.E.P. 1566 (N.D.Ga.1977); and *Cobb v. Avon Products, Inc.*, 71 F.R.D. 652 (W.D.Pa.1976). Numerosity is closely scrutinized. *See, e. g., Scofield v. Bd. of Trustees of Lee County*, 65 F.R.D. 595 (N.D.Miss.1975); *Lee v. Macon County Bd. of Education*, 498 F.2d 1090, 1091 (5th Cir. 1974).

motion to the accounting department which he did not receive. He also applied unsuccessfully for the job of purchasing manager in May, 1975. He asserts that when he refused to train his own successor and said he would quit instead, he was terminated on July 9, 1975. He believes that his termination, his placement in a non-salaried job, and his failure to be promoted were for racial reasons. He and another witness indicated that certain jobs, primarily hourly, were "black jobs" while other categories, primarily salaried, were "white jobs."

In considering the motion to certify a class with James McCarther as its representative, the Court is faced with legal precedents representing conflicting views, some of doubtful viability. When *Reed v. Arlington Hotel Company, Inc.,* 476 F.2d 721 (8th Cir. 1973), was decided, this Circuit made it clear that it favored broad, across-the-board class certification, as did most courts at that time. *See, e. g., Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969). However, even before the Supreme Court handed down *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), which stated in language now well known, if not well understood: [2]

As this Court has repeatedly held, a class representative must be part of a class and "possess the same interest and suffer the same injury" as the class members. the Eighth Circuit had indicated that more than cursory attention must be paid to the requirements of Rule 23 and, in particular, to the requirement of typicality. The court stated in *Wright v. Stone Container Corp.,* 524 F.2d 1058 (8th Cir. 1975), that the purported class representative must show that there are others with similar grievances:

> Except for two vague references at the class hearing, Wright could not identify any person who had been subjected to the same or similar discriminatory treatment as he allegedly suffered .... The typicality requirement of Rule 23(a)(3) obligates the class representative to at least demonstrate that there are other members of the class who have similar grievances.

At nearly the same time as the *Rodriguez* decision, the Court of Appeals reiterated that a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff is required. *Donaldson v. Pillsbury Co.,* 554 F.2d 825 (8th Cir. 1977). In that case the plaintiff offered affidavits by employees who claimed to have suffered discrimina-

**2.** Recently, in *East Texas Motor Freight, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977), the Supreme Court stated that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as class members." Standing alone, this language might suggest that class certification is always inappropriate when there are divergent interests between the named representative and absent class members. However, when read in context, it is evident that the Court did not intend to speak quite so broadly. The cases cited in support of the Court's statement did not concern the interpretation of Rule 23, but rather concerned the standing of the named representative to bring the suit. If the named representative has suffered no injury in fact relative to the class claims, the named representative may lack standing because of the Article III case or controversy requirement. *But cf. Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (standing requirement satisfied by injury to entire class). Moreover, the Court in *East Texas Motor Freight* went on to suggest that

there was an actual conflict of interests between the plaintiffs and the class they were certified as having represented. *See* 431 U.S. at 405, 97 S.Ct. 1891 at 1897. Finally, the procedural posture of *East Texas Motor Freight* was *sui generis* since the court of appeals had certified the class after the district court had made findings indicating that the plaintiffs were not proper class representatives.

Based on these factors, we agree that "[t]he conflict between the permissive and the rigorous approaches to the Rule 23(a) prerequisites was not settled by the Supreme Court's treatment of 23(a) in *Rodriguez.*" Note, Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2), 88 Yale L.J. 868, 882 (1979). *See generally* Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 Harv.L.Rev. 664 (1979). *Scott v. University of Delaware,* 601 F.2d 76, 85 n.19 (3d Cir. 1979). *Cf., O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1973).

tion which, while differing in factual detail, were related to the named plaintiff's claims of discriminatory patterns and practices in employment.

Thus, while the definition of "same interest" and "same injury" was not clarified by *Rodriguez*, in part because of the peculiarity of the facts of that case, and while the circuits remain divided[3] as to whether a strict and narrow standard or an across-the-board approach is to be applied, the Eighth Circuit now appears to be somewhere between the two extremes. It does seem clear, however, that the old *Reed* approach is no longer viable. See *Walker v. World Tire Corp., Inc.*, 563 F.2d 918 (8th Cir. 1977). Further, there is now a clear direction to inquire into, and require, compliance with the particular requirements of Rule 23. See *Rodriguez, supra*, and *Wright, supra*. There is no indication that this Circuit, at least, intends to create a separate, substantive non-Rule 23 class for Title VII actions, as has been suggested by some commentators[4] and rejected by this Court.[5]

*Rodriguez* indicates that even in Title VII cases the Rule 23 standards must be met before a class may be certified, that there must first be an appropriate class, and that the class representative must possess the same interest and suffer the same injury as do the other members of the proposed class.

The mere allegation of racial discrimination is no longer enough, if, indeed, it ever was, to show that a class exists or that the same injury has been suffered.

There is, of course, a common question here, i. e., whether blacks are victims of racial discrimination in their employment at the Camelot Inn. And, although Mr. McCarther did not comply with the Court's pre-hearing orders, the Court, albeit with some hesitation, finds that he is able adequately to protect the interests of those other blacks who possess interests similar to his and who have suffered similar injuries.

It then becomes necessary to determine whether James McCarther is a member of such a class within the meaning of Rule 23 and, if so, its definition.[6] To answer this question, it is first important to consider the nature of the business entity for which he worked, the Camelot Inn, and its organizational structure vis-a-vis the separate interests he wishes to espouse.

The Camelot Inn's employment picture is probably fairly typical of large hotels throughout the country. The bellman, doorman, waiter and maid positions, although not properly described as "dead-end" jobs, are not considered entry jobs into any line, or lines, of progression, nor are

---

**3.** *Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir. 1978); *Hill v. Western Electric Co.*, 596 F.2d 99 (4th Cir. 1979) (Lay, C. J. concurring in part); *Scott v. University of Delaware*, 601 F.2d 76 (3rd Cir. 1979).

**4.** 88 Yale Law Journal 868 (1979).

**5.** *Jones v. MacMillan Bloedel Containers*, 84 F.R.D. 640 (E.D.Ark. Nov. 27, 1979); *Newton v. Kroger*, 83 F.R.D. 449 (E.D.Ark.1979).

**6.** In order for a plaintiff to be certified as a class representative, he must show that he is a member of the class he purports to represent. See *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975). But even before that consideration, the plaintiff must satisfy the threshold requirement of standing. See, e. g., *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). He must show a legally recognizable injury in fact and that his claims are within the zone of interests protected. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The zone of protected interest test is assumedly met in Title VII actions. But the question must be asked whether the named plaintiff himself has suffered an injury in fact from each and every employment practice which he is challenging. Courts which have adopted the across-the-board approach to Rule 23 elements tend to conclude that the plaintiff need not show personal injury in every challenged practice. But many courts have found that there is no standing unless the plaintiff is a member of the class affected by the *specific* practice challenged. See, e. g., *Berg v. Richmond Unified School District*, 11 F.E.P. 1281 (N.D.Cal.1973); *Jackson v. Dukakis*, 526 F.2d 64 (1st Cir. 1975); *White v. Nassau County Police Dept.*, 15 F.E.P. 266 (E.D.N.Y.1977).

When standing is viewed in this latter light, in accord with the requirements set out in *Data Processing, supra*, there is a clear congruence between the elements of Rule 23 and the requisite showing of standing.

they looked upon as a likely recruitment ground for most other hotel employment positions. From the evidence, and the reasonable inferences arising therefrom, it appears that those seeking the position of bellman, doorman, and waiter do so because of the perceived special advantages incident to such jobs, including income from tips which greatly augment the hourly wage paid. Indeed, it is not easy to compare the income of such individuals with that of other employees in the enterprise. The Court's definite impression is, however, that most of these employees seek and prefer such positions over ostensibly higher paying positions because of the working conditions and because there is no imposed limit on their compensation. The evidence presented at the certification hearing did not indicate or suggest that any appreciable number[7] of such employees sought "promotions" or transfers to other jobs in the hotel.

Frequently in Title VII cases blacks contend, and rightly so, that white foremen having hiring authority, and operating without objective guidelines, simply fill jobs from among their friends and acquaintances through "word of mouth." Here precisely the same thing appears to be operating in reverse. Although management has no policy restricting or limiting whites' access to bellmen positions, and in fact there have been white bellmen and white applicants for such positions, nevertheless the evidence indicates that often, when a vacancy occurs, the black bell captain simply calls a friend or acquaintance he believes might be interested and thereby fills the job. This situation obviously contributes to the concentration of blacks in such positions. Of course, when the personnel office is notified of such a vacancy, it lists same with Employment Security Division of the State of Arkansas (ESD). Even in this situation, comparatively few whites apply for such positions. Historical and cultural attitudes contribute to the negative attitude of many whites to such employment, although the situation appears to be changing. In any event, plaintiff offered no evidence tending to show that the defendant was responsible for this phenomenon.

Thus, it is clear that the jobs of bellman, doorman and waiter constitute a special and unique category in the hotel business milieu. People seek and keep these jobs purposefully. Evidence indicates that their actual pay[8] is better than for many in salaried and hourly management positions. The evidence does not show that any, save Mr. Clydes Flemings and Mr. Smith, had any aspiration to fill any other position, and Mr. Flemings never even applied for any other position. He was, he said, discouraged by the apparent racial categorization of jobs. But this allegation is simply not acceptable in the face of evidence which showed that in 1975 (before the lawsuit was filed), 1976, and 1977 there were some black management personnel[9] in the hotel. Plaintiff offered no evidence that, in said period, the defendant imposed any racial barriers, veiled or otherwise, to any of its employees seeking promotion or different positions in the enterprise. Under such circumstances, *Rodriguez* requires something more in the way of affirmative and overt indication of the employee's desire in order to evidence a cognizable promotion interest.

7. The evidence indicates that Richard Smith sought and did not receive a promotion from the bellman position. Clydes Flemings did not seek a promotion because he was discouraged, he says, by the apparent lack of opportunity for blacks.

8. Clydes Flemings testified that he earned $1.60 an hour plus tips. He estimated that his tips constituted one-half of his compensation and that he made approximately $130 per week. Another bellman estimated his weekly take-home pay to be $150–$200. According to the testimony of Gary Wood, general manager, in the Controller's Office, one salaried college graduate makes $12,000 per year and another makes $900 per month. Purchasing clerks are paid $3.75–$4.00 per hour and front desk clerks earn $3.62 per hour. Sales personnel earn $900–$1,200 per month. Inspectresses earn $3.45 per hour and housekeepers earn $3.10.

9. The 1975 EEO report indicates that there was one black "official and manager" and two minority "professionals." The 1976 EEO report indicates that there were five black "officials and managers." The 1977 report shows six "officials and managers."

The group which was employed in the banquet service is a similar, self-selected group. None came forward to allege discrimination in any form, nor did the plaintiff identify any claiming or experiencing such discrimination.

So it would seem to be counterproductive to assume a homogenization of "promotion interest" among all blacks who work at the Camelot Inn. The evidence indicates that employees in the bellman-waiter type categories rarely seek "promotion" to other jobs basically because they do not consider those other jobs as attractive or to represent any real advancement. James McCarther is not part of that class for consideration of discriminatory promotion claims; his interests are not the same and his alleged injury is not the same.

Who then would comprise a class with a "promotion interest" which McCarther might appropriately represent? Blacks who were employed in administrative, management or quasi-management positions who were denied promotion or suffered discrimination in the conditions of their employment would make up such a class. If the class is so defined, however, the requirements of numerosity and typicality loom as formidable barriers to the certification of such a class here.

Relying on the EEO reports from 1974 through 1979, the class would include 29 black managers, many of whom are obviously duplicated on each successive report, having been employed for more than one year. If the class were not limited to managers but were expanded to include black professionals, technicians, craftsmen, sales workers and office workers, all with whom

McCarther arguably might have a community of "promotion interest," there would be a total of 48 more on the obviously duplicative reports.

Professor Miller has indicated that a showing of above 40 potential class members usually warrants a finding of the required numerosity, although other factors must be considered, of course. See A. Miller, An Overview of Federal Class Actions: Past, Present and Future, 22–23 (1977). Given the evidence indicating the long tenure of many of the employees counted above, it is very unlikely that there are as many as 20 individuals involved; at any rate, the plaintiff did not make an adequate showing of the numerosity of a class of blacks denied promotions because of race.

In his answers to interrogatories filed December 27, 1979, Mr. McCarther listed 18 persons said to be members of the class he wishes to represent in an effort to show the typicality of his claim to those of other blacks. Despite being ordered to do so,[10] he gave no facts in support of these claims until the hearing, at which time his testimony indicated that his knowledge was very recently acquired, often vague, and sometimes patently inaccurate. He was wrong in stating that one employee had terminated himself when in fact he still works at the Camelot Inn. One person on his list, the evidence shows, is white. He was vague in stating when and where he talked with certain others. And in most instances he made only the most nonspecific kind of allegations of racial discrimination. Even were this hearsay evidence to be accepted over the objection of the defendant,[11] it

**10.** The defendant propounded interrogatories to Mr. McCarther on December 29, 1978. On November 6, 1979, by motion the defendant sought to compel response, and McCarther was directed by the Court to answer forthwith. There was no response. On December 18, 1979, this Court set a December 27, 1979 deadline, with which the plaintiff partly complied. The answers now given, on the ground of incomplete discovery, were promised to be included in the class certification brief. (The discovery deadline of December 31, 1978, had been previously extended four times at the plaintiff's request.) Some of the answers given

were conclusory, general, or a recitation of names only. In fact, the missing answers were not forthcoming until the class certification hearing, at which time the defendant objected to their admission.

**11.** In certification hearings, the showings required by Rule 23 must generally be made by competent admissible evidence. Hearsay testimony concerning other claims generally will not suffice. However, since the certification hearing does not reach the merits of the underlying Title VII cause of action, affidavits from others who personally have claims similar to

would have little probative value in indicating that Mr. McCarther's claim is typical of others in the purported class.[12] The virtual admission by his counsel that the information was deliberately withheld when answers to interrogatories were given, despite the Court's orders, indicates, however, that the sanctions of Rule 37 should be applied to this evidence. The testimony of Mr. McCarther, therefore, concerning the bases of the alleged claims of the 18 persons will be stricken and therefore cannot be relied upon in resolving any issue related to class certification.

Some admissible evidence of typicality, however, was submitted, after the hearing but without objection by the defendant, including charges of discrimination filed at the EEOC by three other former Camelot employees, Lynn Hickman, Doretha Summerville, and Robert Webb. One, Mr. Webb, alleged that he did not receive the promotion to which he was entitled. But when the evidence is measured by the *Wright v. Stone* requirement, it is clear that the typicality requirement for a "promotion" class is lacking. *See also, Newton v. Kroger*, 83 F.R.D. 449 (E.D.Ark.1979). The plaintiff must show that there are other members of the class who have the same or similar grievances. Here he identified Mr. Flemings, who testified at the hearing, Mr. Smith, who testified by deposition, and Mr. Webb, for whom he provided no affidavit or appearance. No one else who would come within the parameters of this "promotion" class was identified by the evidence. Such a showing (particularly considering that neither Mr. Flemings nor Mr. Webb asserted that they had actually applied for promotion, and that neither Mr. Flemings nor Mr. Smith would be members of the class about which we are concerned) is insufficient.

Although the named plaintiff has alleged discrimination additionally in layoffs and rates of pay, he has made no credible showing that anyone suffered unequal treatment in these particulars. *Cf. Tuft v. McDonnell Douglas Corp.*, 581 F.2d 1304 (8th Cir. 1978).

▪ The plaintiff has also alleged that he should be allowed to represent a class of blacks at the Camelot Inn who have been placed into non-salaried job classifications or into segregated job classifications because of discriminatory recruiting practices.

First, there was no evidence to indicate that Mr. McCarther was assigned to a non-salaried position because of any decision by the defendant. He applied for and received the job he sought. Further, there is no evidence to indicate that defendant's classification of jobs as hourly paid positions or salaried positions had any racial overtones at all.

When the Camelot Inn first opened, the "promotable" positions, as defined above, were all filled by whites. Some positions apparently were salaried and some were hourly. As blacks were recruited and filled some of these positions, the situation did not change. Some "promotable" positions continued to be hourly and some salaried.

Most applicants, the log shows, apply for specific positions. They do not, according to any of the evidence, ask specifically for a salaried or an hourly-pay job. Mr. McCarther did not. Not all hourly jobs are out of the line of progression. In any case, there are many more hourly than salaried jobs. Among hourly employees are the cashier, some of the desk clerks, the night auditor, maintenance man, the PBX operator, cooks and the retail store clerks. Among salaried workers are the reservation clerk, executive housekeeper, sous chef, other maintenance men, the income auditor, and accounting clerk. It is difficult to discern a pattern to the allocation of hourly or salaried pay, but the plaintiff did not show

---

the representative party may suffice. *See Pillsbury, supra.*

12. It should be noted that, contrary to the situation in *Pillsbury*, plaintiff offered no affidavits or testimony from any of the 18 persons, except Flemings, who he contends have claims

similar to his. There is, therefore, no competent evidence that the claims exist, or, indeed, that any of such individuals are in fact complaining, although their failure to complain is not determinative in and of itself.

that he belonged to a class of persons which had been assigned hourly jobs because they were black. Both the existence of such a class and the typicality of Mr. McCarther's claim to the claims of such class members have not been shown.

Next, as has been previously explained, the fact that the banquet waiter, doorman, and bellman positions were staffed by blacks is attributable to the special situation obtaining at the Camelot Inn. Additionally, there is no evidence to sustain the contention that the recruiting practices at the Inn were, in fact, discriminatory or that there was any racial discrimination practiced in initial assignments.

The Camelot's policy is generally to permit promotion from within and, to this end, department heads are informed at meetings each week of all vacancies, which they are then directed to, and do, pass on to their supervisees. Some do so by posting a notice; others do so by word of mouth. This internal notification system is in addition to the listing of such vacancies with the ESD and newspaper advertisements. See below.

The personnel secretary, Laura Wagner, testified that she keeps an applicant log registering every applicant. The log indicates that most people apply for a specific position, although some indicate they will take anything. These applicants come from many sources. Some walk in, and the Court finds Ms. Wagner's testimony to the effect that she advises such applicants of all available openings to be credible. And there is no evidence to the contrary. Other interested persons respond to defendant's job listings with the ESD. The majority, however, come in because of newspaper ads. Most, but not all, jobs are advertised in at least one paper, including the Arkansas Gazette, Arkansas Democrat (both having statewide circulation in Arkansas), and other newspapers of general circulation in Dallas, Memphis, St. Louis, and Houston. Management and white collar jobs are advertised as well as housekeeping, kitchen, and porter positions. There was testimony that the management had made a special effort to recruit from among its black employees for supervisory personnel, but that such efforts have not always succeeded.

Mr. McCarther learned of the job for which he was hired when he checked with the ESD. Mr. Smith learned of the opening for bell captain from an ad in a newspaper. Thereupon he applied for, and was initially placed in, that job. Ms. Wagner, herself, learned of her job opening through a newspaper ad.

It is true that there is decentralized hiring authority, but there has been no showing of any policy or practice of discrimination in initial assignments or in categorizing applicants or job openings.[13]

At the hearing Mr. McCarther pointed to the typing test given to applicants for certain jobs as being discriminatory, even though the practice was neutral on its face. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1974). This is the only test challenged by the plaintiff. The evidence indicated that those persons who took such a test did in fact type at least part of the time. But more importantly,

---

**13.** Although plaintiff was given the opportunity to put on an expert witness to make statistical analyses of certain documentary exhibits received in evidence, particularly certain EEO reports, he ultimately abandoned the effort and has relied instead upon statistical arguments unsupported by any expert opinion. Of course, this approach is sometimes acceptable if all of the predicates for the statistical analyses and arguments are in evidence, without ambiguity, and if the statistical postulants and theories in question are relatively simple, not requiring elaboration or explanation by an expert witness. Such, however, is not the case here. The accuracy of the representative samples are clearly in question. How the Chi-Square test operates in such a situation has not been explained by any expert. Therefore the arguments based thereon must be disregarded. This does not mean, however, that the documentary evidence itself, such as the EEO reports, may not be considered. Indeed, such evidence is important both at the class certification stage and the trial on the merits of Title VII cases. Leaving aside the attempted technical analysis of the data, that data itself does not make a case for discriminatory impact of defendant's policies and practices. On the contrary, it shows steady, if uneven, progress in the increasing numbers of black employees throughout most of the job classifications in the hotel.

Mr. McCarther was not given such a test and was in no way disadvantaged by the Camelot's practice of giving typing tests. Neither did he bring forward any employee, ex-employee, or applicant who had been asked to take such a test. The evidence does not show the existence of any class of blacks who suffered racial discrimination from administration of a seemingly neutral test. And if there were such a class, it would be difficult to see that Mr. McCarther would fulfill the typicality requirement of Rule 23. Thus, no class of those who, it is alleged, suffered discrimination because of testing will be certified.

From the foregoing it is clear that the plaintiff has not shown that discrimination in recruitment or initial job assignment has led to the creation of a class of disadvantaged black employees who have been impermissibly placed into segregated job categories. There is, in short, no such class for Mr. McCarther to represent. His own placement as purchasing clerk in a line of progression job would indicate that even were there such a class, he could not represent it, not possessing the same interest or having suffered the same injury. *See Rodriguez, supra.* It must be recalled in this connection that he was given the very job he applied for and that he became aware of that position through the defendant's listing of same with the ESD.

■ However, the claims relating to termination as distinguished from claims relating to hiring, initial assignment, promotion, layoff, and rates of pay must be seen in a different light. While the nature of the corporate entity with its peculiar stratification as previously discussed is an important consideration when the issue concerns promotion and certain other aspects of employment, such consideration does not have the same effect when the claim is simply that blacks are terminated because of their race. Such a claim more simply and readily cuts across job classifications. If such a discriminatory policy in truth exists, it would disadvantage any black in any job at the Camelot Inn.[14] And it would not depend in any significant way upon the differences in the duties and responsibilities of, or the qualifications for, the many and varied jobs at the hotel. If blacks are terminated for racial reasons, as a result of a company policy or practice, there is the same injury to each person affected by that policy and that injury would be "plainly rooted in the same bias." *See Pillsbury, supra,* at 831 and *Rodriguez, supra.* The interest of all blacks in the enterprise, regardless of position, in keeping their jobs and the injury suffered by each if terminated because of his or her race are the same as that which Mr. McCarther alleges.

The plaintiff submitted evidence to indicate that a large number of blacks have been terminated from their employment at the Camelot Inn, including the named plaintiff. A listing of inactive employees since 1975 indicates that there are over 600 former black employees. Even discounting for those who quit voluntarily, there can be little doubt that a class composed of terminated blacks would meet numerosity requirements.

Blacks are terminated at a higher rate than are whites according to the plaintiff's evidence. Not only the named plaintiff, a purchasing clerk, but also several others indicated that they considered their discharge to be racially based. Mr. Clydes Flemings, a former bellman, contends that he was discharged for a discriminatory reason, in that he, a black, was terminated because, he asserts, he had breakfast with a white woman in the hotel coffee shop while

---

14. Some would argue that this same reasoning could be applied with respect to a class of all blacks in the enterprise who have sought and been denied promotions because of their race. That is the very superficial reasoning that so frequently leads courts to opt for across-the-board certification in race discrimination cases. The rationale is that race discrimination is, per se, class discrimination and no further inquiry is needed. This case clearly shows that Mr. McCarther has no "promotion interest" in common with the bellmen and waiters. Nor can some of the other Rule 23 requirements be met in that regard. But the termination claim in the context of the facts of this case does cut "across the board."

on duty.[15] Lynn Hickman, a bus helper, and Doretha Summerville a laundry supervisor, filed EEOC charges alleging discriminatory discharges. Mr. Smith in his deposition pointed to a black chef who was replaced by a white, and to "Flossie," who was replaced by a white as head of the housekeeping department.[16] The named plaintiff has thus shown his claim of racially based termination to be similar to, and thus typical of, others, meeting, albeit it minimally, the requirements set out in *Wright v. Stone Container.* He has shown that such claims are found throughout many job levels at the Inn.

When the class is defined to include all black employees and ex-employees who have been at any time involuntarily terminated by the Camelot for racially discriminatory reasons, with James McCarther as their representative, all the requirements of Rule 23 are met and such class and such representative will be so certified.

There are, of course, jurisdictional timeliness requirements which will define the parameters of the class for damages. Individuals whose Title VII claims arose in the period of 180 days prior to the filing of James McCarther's EEOC charge may be included in the class. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975). *See* 29 C.F.R. § 1601.13(a) (1979), which states:

> [T]he timeliness of a charge shall be measured for purposes of satisfying the filing requirements of § 706(e) of Title VII by the date on which the charge is received by the Commission.

The EEOC date stamp on McCarther's charge is July 25, 1975.

The applicable statute of limitations for actions pursuant to 42 U.S.C. § 1981 is three years. Both parties agree that any individual whose cause of action arose prior to June 21, 1973, may not be included in the class. *Marshall v. Electric Hose & Rubber Company,* 68 F.R.D. 287 (D.Del.1975); Ark. Stat.Ann. § 37–206 (1962).

■ The decision to certify a class and its representative is in no way a decision on the merits. *Eisen v. Carlisle Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). When certification is reserved until the trial on the merits, or afterwards, the failure of the class representative to sustain his claim may in some situations be fatal to class certification. *See Rodriguez, supra.* But the posture of a case in which the district court follows the general directive to decide the class issue as early as possible, Rule 23(c)(1), is decidedly different. *Scott v. University of Delaware,* 601 F.2d 76 (3d Cir. 1979). It is possible that when a trial on the merits is held the claim of the named plaintiff will be shown by the defendant to be baseless. Still, once a class is certified, a decision concerning class-wide alleged racial discrimination in the employment relationship is proper even though the class representative's claim proves to be invalid. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). It is incumbent upon the plaintiff, under Rule 23, to make some minimal showing that a company-wide policy or practice of discrimination exists, as was noted in *NOW, St. Paul Chapter v. 3M Co.,* 14 F.E.P. 829, 834 n.7 (D.Minn.1976):

> The court is not suggesting that a class action will fall unless the discriminatory policy or practice affects all class members in the same way. [Citation omitted.] Neither is the court suggesting that a merit hearing is appropriate prior to certification. [Citation omitted.] *It does seem incumbent upon the plaintiffs, however, to make some minimal showing that a company-wide policy or practice exists prior to exposing the defendant company to years of discovery and a lengthy period of litigation.*

---

**15.** Of course, there was evidence to the contrary but the Court may not reach the merits of such issues when considering class certification issues. *See Eisen v. Carlisle Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

**16.** The Court notes this testimony but does not rely upon it because of its hearsay nature.

(Emphasis added.) Here that minimal showing has been made on one of the plaintiff's claims and for that claim a class will be certified.

 Mr. Clydes Flemings filed a motion to intervene subsequent to the class certification hearing. Because his claim, save for his claim related to discriminatory termination, is based on employment of a type totally different from that of James McCarther (see above), there is not the required commonality in questions of law or fact. Rule 24(b). His motion also is not timely. By broadening greatly the scope of the evidence which would necessarily be adduced in support of his other claim, the adjudication of the rights of the defendant would be delayed and prejudiced. Since he will be part of the class represented by Mr. McCarther concerning his termination claim, there is no need for his intervention with respect to this issue, it having been determined that such a class has an adequate representative.

 The plaintiff has, in addition to his motion for class certification, filed a motion for partial summary judgment pursuant to Rule 56(d). Such motion may be granted only when there are no disputed questions of material fact and only in the Court's discretion. The defendant properly addressed the certification issue at the hearing, and did not address the issue which is presented by the plaintiff's motion on the merits. The adjudication of the issue of a prima facie showing is intertwined with the totality of proof under any analysis of a Title VII claim. The trial on the merits is scheduled for March 31, 1980, and at that time the adequacy of the prima facie showing can be determined in light of all the evidence. In a discussion of the Court's discretion to deny a motion for summary judgment, Professor Moore states:

[T]he court must necessarily evaluate the character of the record in light of the legal issues; and it should take care not to adjudicate difficult or complicated legal issues, either of a private or public nature, upon an inadequate factual basis. A sound appraisal may demand that the

motion be denied and that the case proceed to trial. In *Pacific American Fisheries v. Mullaney* plaintiff sought an injunction against the enforcement of a fishing license tax on the ground of unconstitutionality. In reversing summary judgment for the defendant, the court of appeals found that plaintiff had been wrongfully deprived of an opportunity to oppose the motion and added:

"Because of the importance of the issues presented in this suit, we think that it is not one to be disposed of by summary judgment, even if proper motion for such judgment had been made or proper opportunity afforded for appropriate showing by affidavit or otherwise."

Where there is no genuine issue of material fact underlying liability, it is clear that the court may make an interlocutory summary adjudication although there is a genuine issue as to the amount of damages. The trial court, however, may deny a properly supported motion as to liability where damages and liability can be tried more conveniently in a single hearing on the merits. It is also clear that when the general principles warrant a summary judgment on one or more but less than all of the claims in an action, the court may make such an adjudication in reference to those claims although one or more other claims remain pending. But if the claims adjudicated are not actually "final" or there is no justification in entering judgment on these claims before a trial on the remaining claims, it has been held an abuse of discretion to enter a final judgment as to such claims.

The court may exercise a sound discretion in shaping up the case, and courts have sometimes denied summary judgment on such portion of an action as might be ripe for it when in doing so a more orderly or expeditious handling of the entire litigation could be achieved, or where the portion of the claim ripe for summary judgment is intertwined with other claims or defenses that must be tried.

6 Moore's Federal Practice ¶ 56.15[6] pp. 611–13 (2d ed. 1979). Here genuine issues of fact remain. No partial summary judgment will, in light of these considerations, be granted.

It is therefore Ordered that the claim of Richard Smith be, and it is hereby, dismissed.

It is Ordered that the claim of Rick Presley be, and it is hereby, dismissed.

It is further Ordered that the motion to intervene filed by Clydes Flemings be, and it is hereby, denied.

It is Ordered that the motion for partial summary judgment be, and it is hereby, denied.

It is also Ordered that the motion for certification of a class be, and it is hereby, denied in part and granted in part, in accord with the foregoing opinion.