Robert **CLAYBORNE**, Angela Sanders, Lelia Johnson, Georgianna Brown, Shawn Moore, and John Smith, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**OMAHA PUBLIC POWER DISTRICT**, Defendant.

No. 4:00CV540.

United States District Court, D. Nebraska.

July 25, 2002.

**578**

Marlon A. Polk, Thomas D. Waldman, Dana E. Christian, Polk, Waldman Law Firm, Omaha, NE, for plaintiffs.

George C. Rozmarin, Robert F. Rossiter, Jr., Timothy J. Thalken, Fraser, Stryker Law Firm, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on the Magistrate Judge's report and recommendation (filing 53) and on Plaintiffs' statement of objections thereto (filing 56), filed as allowed by 28 U.S.C. § 636(b)(1) and NELR 72.4.

Upon de novo review, I find that inasmuch as Magistrate Judge Piester has fully, carefully, and correctly found the facts and applied the law, the report and recommendation should be adopted, and Plaintiffs' motion for class certification (filing 45) and motion for oral argument (filing 51) should be denied.

Accordingly,

IT IS ORDERED that:

(1) the Magistrate Judge's report and recommendation (filing 53) is adopted;

(2) Plaintiffs' statement of objections (filing 56) is denied;

1. The federal statute that establishes the authority of federal magistrate judges, 28 U.S.C. § 636, treats motions "to dismiss or permit maintenance of a class action" as "dispositive" motions requiring the consideration of the trial judge. 28 U.S.C. § 636(b)(1)(A). Consequently, I shall provide a report and recommendation, rather than order, with respect to this motion. *See* 28 U.S.C. § 636(b)(1)(B).

2. Plaintiffs' amended complaint contains a more expansive listing of discriminatory action than

(3) Plaintiffs' motion for class certification (filing 45) is denied; and

(4) Plaintiffs' motion for oral argument (filing 51) is denied.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Before me for consideration is plaintiffs' motion for class certification, filing 45.[1] Plaintiffs' motion requests an order certifying a class in this action; declaring that this case be maintained as a class action; designating the named plaintiffs as class representatives; and appointing the plaintiffs' present counsel of record as counsel for the class. The plaintiffs have defined the class as:

> [A]ll African Americans who are now or have been since October 1996 employees of Omaha Public Power District ("Defendant") and who Defendant, through its discriminatory policies and practices treated less favorably in the course of their employment because of their race.

(Filing 45, Motion For Class Certification ¶ 1). For the reasons discussed herein, I conclude that the plaintiffs' motion should be denied.

Plaintiffs allege that class designation is appropriate under Rule 23(a), 23(b)(2),and 23(b)(3) of the Federal Rules of Civil Procedure. They allege that the proposed class consists of "approximately 150 African American employees that have been discriminated against by the employment policies and practices of Defendant from October 1996 to the present." *Id.* at ¶ 2(a). The common questions of fact "include, but are not limited to [denial of] promotions, equal pay, training opportunities and fair performance evaluations." *Id.* at ¶ 2(b).[2] Plaintiffs allege that

is addressed in the motion for class certification. The complaint alleges a "general practice of discriminating against African Americans with regard to hiring, compensation, promotion, job assignments, training opportunities, transfers, layoffs, discharge, retaliation and disciplinary practices." Filing 33, Amended Class Action Complaint at ¶ 20. Paragraph 21 provides a more detailed description of these alleged discriminatory practices. The plaintiffs' motion does not state that plaintiffs are requesting a class certification for the issues of hiring, job

the class members' rights under Title VII, 42 U.S.C § 1981, and the Nebraska Fair Employment Practices Act ("NFEPA") have been violated. Plaintiffs have designated the following as the common questions of law:

i. Whether OPPD has and continues to maintain a pattern and practice of illegal discrimination based on race;

ii. Whether OPPD has intentionally engaged in this discrimination;

iii. Whether OPPD has and continues to maintain policies and procedures with respect to African American employees that have operated to deny African–American employees equal opportunities for training opportunities, and whether such practices have had an adverse disparate impact on African American employees;

iv. Whether OPPD has and continues to discriminate against African American employees because of their race with regard to promotion to management and/or supervisor positions, including whether such practices have had an adverse disparate impact on African American employees;

v. Whether OPPD has and continues to maintain policies and procedures which result in African Americans being compensated less than white employees because of their race, including whether such OPPD practices have had an adverse disparate impact on African American employees;

vi. Whether OPPD has and continues to maintain policies and procedures with respect to [sic] which operate to discriminate against African American employees by subjecting them to different terms and conditions of employment because of their race including whether OPPD's practices have had an adverse disparate impact on African American employees; and

vii. whether injunctive relief is appropriate as a remedy for OPPD's past, present and future discrimination.

*Id.* at ¶ 2(b)(i–vii).

The plaintiffs allege that their grievances and claims arise from the same pattern or practice of discrimination experienced by the class members. Specifically, the motion for certification alleges:

Named Plaintiffs were similarly deprived of equal employment opportunities for promotions into management and other supervisory level positions, equal pay, training opportunities and fair performance evaluations, all of which have placed them in less desirable employment positions and caused them to suffer the same injury as the class members.

*Id.* at ¶ 2(c). Plaintiffs further allege that they, and the present counsel of record, can fairly and adequately protect the interests of the prospective class. *Id.* at 2(d).

■ A plaintiff moving for class certification has the burden of showing that the class should be certified and that the requirements of Rule 23 are met. *Coleman v. Watt,* 40 F.3d 255, 258–59 (8th Cir.1994). Under Rule 23(a), one or more members of a class may sue or be sued as representative parties on behalf of all class members if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and,

(4) the representative parties will fairly and adequately protect the interests of the class.

---

assignments, transfers, layoffs, discharge, retaliation, or disciplinary procedures. This omission indicates that either these claims are no longer part of the suit, remain in this lawsuit to be decided in separate trials brought by the plaintiffs on an individual basis, or are perceived by plaintiffs as within the scope of the issues "include[d], but [ ] not limited to denying promotions, equal pay, training opportunities and fair performance evaluations." (Filing 45, Motion For Class Certification ¶ 2(b)).

Plaintiffs' reply brief states that "Plaintiffs are challenging Defendant's policies and practices related solely to promotions, compensation, training and evaluations, all of which were and are subjectively implemented by Defendant." Plaintiffs' reply brief at p. 7. Therefore, it appears that many issues listed in the amended complaint will not be determined in a trial brought by any class designated in accordance with plaintiffs' motion.

*Id.* These prerequisites for class certification under Rule 23(a) are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

In determining whether the plaintiffs have met this burden of proof, the court may not consider the factual merits or weaknesses of plaintiffs' underlying claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, a class determination "generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982)(citing *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)).

> Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372. Although the court does not at this stage examine and determine the merits of the plaintiffs' case, it may properly consider evidence relating to the discrimination allegedly suffered by the class, as well as the manner in which that evidence fits into the legal framework governing the claims pleaded. *Nelson v. United States Steel Corp.,* 709 F.2d 675, 679 (11th Cir.1983).

Plaintiffs' mere assertion that their claims and the claims of the potential class members all arise from overall racial prejudices that allegedly exist at defendant's facilities is insufficient to carry the burden of proving that their claims are typical of the claims of the potential class members. *Caviness v. Nucor–Yamato Steel Co.,* 61 Fair

Empl. Prac. Cas. (BNA) 1634, 1993 WL 330648 (E.D.Ark.1993). "Such a broad theory could be used to turn nearly all Title VII lawsuits into class actions purporting to represent every employee, applicant, and potential applicant of a certain protected group." *Id.*

The prior deferential application [3] of Rule 23 to Title VII cases was abrogated by *Falcon,* a 1982 Supreme Court decision. A "Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon,* 457 U.S. at 161, 102 S.Ct. at 2372. "*Falcon* effectively overruled many lower court decisions, not only those which failed to analyze the 23(a) prerequisites carefully—according to the traditional across-the-board approach—but also those which construed them broadly, to the possible or potential detriment of absent class members." *Employment Discrimination,* § 81.03[4] (Matthew Bender 2d). "[C]lass certification is no longer a nearly automatic outcome." *Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 660 (N.D.Ga.2001)(citing *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364). Following the *Falcon* decision, "Rule 23 requirements must be strictly applied in all class actions, including private actions under Title VII." *Roby v. St. Louis Southwestern Ry. Co.,* 775 F.2d 959, 961 (8th Cir.1985).

### I. The Named Plaintiffs

To be given the authority to represent a class, a named plaintiff must have common interests with class members and the ability and willingness to vigorously prosecute the interests of the class. *Paxton v. Union Nat'l Bank,* 688 F.2d 552 (8th Cir. 1982). A fundamental requirement of maintaining a class action is that the representatives must be members of the classes or subclasses they seek to represent. The representatives must also possess the same in-

---

**3.** The plaintiffs cite *Wright v. Stone Container Corp.,* 524 F.2d 1058, 1061–62 (8th Cir.1975), and *McCarther v. Camelot Inn of Little Rock,* 513 F.Supp. 343, 344 (E.D.Ark.1980), both of which were decided prior to the Supreme Court decision in *General Telephone Co. of Southwest v.*

*Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), in requesting this court to liberally construe its Rule 23 motion to effectuate the remedial policy of Title VII. Plaintiffs' brief at p. 6.

terest and have suffered the same injury as the members of the class. *Roby*, 775 F.2d at 961. It is therefore incumbent in any analysis of a motion for class certification to evaluate the specific claims and injuries of the named plaintiffs to determine both the parameters of any class to be certified, if any, as well as their ability to represent that class.

There are six named plaintiffs in this action. They are each African American, but they have different job qualifications and backgrounds, and different allegations of defendant's discriminatory conduct and the harm resulting from that conduct. With the exception Mr. Smith, they all work in the downtown OPPD location, in different departments, and under different supervisors. The African Americans they intend to represent also work in diverse positions, in distinct departments under differing supervisors, and in every location of the company. (Exhibit 35, Johnson, 169: 9–171:1; Exhibit 37, Moore, 120:3–121:20; Exhibit 38, Smith, 122:8–123:14; Filing 33, Amended Complaint ¶ 51).

The named plaintiffs also have distinct positions within the company. Mr. Clayborne is an exempt manager within OPPD and his employment is not subject to the terms of a collective bargaining agreement. Other than Mr. Clayborne, the remaining named plaintiffs previously held or now hold union positions subject to the terms of their union agreements. Mr. Smith is a member of Local 763, International Brotherhood of Electrical Workers, and the remaining union plaintiffs are members of Local 1483 of the International Brotherhood of Electrical Workers. Exhibit 37, Moore, 120:18–25, Exhibit 39, affidavit of Carl J. Olsen ¶ 20. All of the named plaintiffs describe, through allegations in the amended complaint and deposition testimony, their individual experiences with alleged racial discrimination in their employment for OPPD.[4]

### 1. Robert Clayborne

The named plaintiff, Robert Clayborne, alleges that defendant repeatedly denied his requests for promotion into senior level positions for which he was qualified. (Filing 33, Amended Complaint at ¶ 9), and also in work assignments, compensation, and cross-training opportunities. *Id.* at ¶ 37, 38(c). His testimony reveals discrimination claims in promotion, compensation and training.

In 1978, when Mr. Clayborne became a senior buyer for the defendant, the position had previously been salaried. When he started the job, it became an hourly position. (*Id.* at ¶ 37(b)). Mr. Clayborne claims that in 1982, 1985, and 1991, management positions became open but were not posted in accordance with defendant's policies, thereby depriving him of the opportunity to apply. (*Id.* at ¶ 37(c)). Mr. Clayborne never applied for these positions. (Exhibit 33, Clayborne, 222:17–223:2). He alleges that he did apply

---

4. A significant difficulty in analyzing this motion for class certification arises from the disparity between paragraphs 9 through 14 and paragraphs 37 though 52 of the amended complaint, and the deposition testimony of the named plaintiffs offered by the defendants in opposition to this motion. The discussion of these disparities in this report and recommendation is not intended to comment on the merits of the underlying case, but to assess the actual basis of each named plaintiff's claim of discrimination and his or her ability and willingness to adequately perform the responsibility of a class representative for those similarly situated. To the extent that the amended complaint is inconsistent with the testimony of these named plaintiffs, the court assumes the testimony is truthful and any contradicting allegations, which were drafted by counsel and not the parties, are incorrect, an over- or understatement of that named plaintiff's claim, or perhaps a product of using boilerplate allegations to describe very fact-specific claims. (compare,

amended complaint paragraphs 38, 41 (at p. 24), 44, 47, 50, and 52). See, *Roby*, 775 F.2d at 962 (court disregarded plaintiff's allegation of discrimination in promotion, and found him inadequate to represent class, where plaintiff testified he was not interested in and had not sought promotion).

The deposition testimony of the named plaintiffs was offered into evidence by the defendants and heavily referenced in defendant's brief. Some of these references overstated the record or were interpreted out of context, further confusing the issues. The named plaintiffs offered only the amended complaint allegations as evidence of their personal experiences while working for OPPD, yet when their deposition transcripts were submitted in opposition to the motion, and though given leave to submit a reply brief, the plaintiffs did not cite to this deposition testimony and explain its context in light of the allegations of the amended complaint.

for a management position in 1998 that was going to be open and paid a salary of $72,000, but that when he applied, he was told the position was canceled and the department was being reorganized to increase the managerial positions from one to three. One of these created positions was then offered to him in November 1998 with a salary midpoint of $58,000 and he was given a 24–hour deadline to accept or reject the position. He rejected that position, and the newly created positions were not filled for several months. (Filing 33, Amended Complaint at ¶ 37(d–e); Exhibit 33, Clayborne, 158:7–158:24). He alleges that he worked for almost five years without being given a performance appraisal or merit pay increase, resulting in emotional distress. (Filing 33, Amended Complaint at ¶ 37(f)). However, by deposition, Mr. Clayborne acknowledged that he did receive performance appraisals during that time frame and stated he did not know if he received pay increases. (Exhibit 33, Clayborne, 221:24–222:16).

Mr. Clayborne accepted his current management position for the defendant in April of 1999 with a $62,000 salary. As of the time of his deposition in October 2001, his salary was $72,000. He is dissatisfied with his current job and believes he should hold the position of his supervisor, Ed Jackson, who is division manager, material management. According to the allegations, although Mr. Clayborne's requests for training were never refused, he was not treated the same as Mr. Jackson who, unlike Mr. Clayborne, did not have a college degree but was provided specific "stepping stones" to obtain his management job with OPPD. *Id.* at 219:6–220:2. The division manager, material management position was not posted. Mr. Jackson was appointed to it, and following organizational changes in the· department, Mr. Jackson offered Mr. Clayborne the management position he now holds. *Id.* at 157:15–158:2; 227:13–228:21. Mr. Clayborne filed a timely charge of discrimination with the EEOC, and having obtained no decision from that agency within 180 days, obtained a notice of his right

to sue. (Filing 33, Amended Complaint, attached Ex. A.)

Mr. Clayborne believes the defendant has failed to provide equal opportunities for African Americans to secure supervisory and management positions with OPPD, and as class representative, hopes to secure union and management promotions and better pay for class members throughout the company's diverse departments and locations. He is unable to articulate a specific policy or procedure used by OPPD that has had a discriminatory impact on the class, but believes the low percentage of African Americans in management positions is evidence of the lack of equal opportunities being offered to class members. *Id.* at 229:1–238:6.

### 2. Angela Sanders

Angela Sanders worked for OPPD for eleven years, until July 2, 1999. She alleges that her applications for six promotions were rejected in favor of white employees who were less than or equally qualified for the positions. (Filing 33, Amended Complaint at ¶ 10). She also alleges that she was not permitted to transfer to divisions that provided a greater opportunity for advancement. *Id.* (Amended complaint paragraph 41 (beginning at page 22)[5]). She also alleges that she experienced or observed racial discrimination in "work assignments, training opportunities and compensation." *Id.* at p. 22, ¶ 41(c). Her testimony, however, reveals her discrimination claims are limited to the areas of promotion. Her single assertion of unequal pay is time-barred, and her testimony specifically refutes any claim that she was denied training and cross-training opportunities on the basis of race.

Ms. Sanders claims that in 1994, she requested a job transfer from OPPD's 76th and Dodge Street location to its headquarters in downtown Omaha. She states that to obtain this transfer, she had to accept a demotion and a pay decrease although two white employees, who also requested a transfer to the downtown location, did not incur a pay loss or demotion when they received the transfer.

---

5. The Amended Complaint contains mis-numbered paragraphs. There is a paragraph 41 that begins on page 22 and one that begins on page

24. These page numbers will be used to distinguish the paragraph 41 references herein.

*Id.* at p. 22, ¶ 41(a); Exhibit 34, Sanders, 62:1–70:25. She had the option of remaining at the 76th and Dodge Street location with no pay loss or demotion. (Exhibit 34, Sanders, 95:1–14). As set forth in the Amended Complaint, in 1994, Ms. Sanders obtained a bachelor's degree in paralegal studies. Three years later, she was told that her degree would be an asset in obtaining a management position. However, in February 1997, her application for a supervisor position in Customer Care was rejected in favor of a white woman who Ms. Sanders believed had only a cosmetology license. She filed an internal complaint, and although the complaint was denied, she and five other employees were placed in a special six-week supervisor training program. *Id.* at p. 22, ¶ 41(b–c). Four of the trainees were white, one was Hispanic, and Ms. Sanders is African American. (Exhibit 34, Sanders, 102:1–103:5). At the end of the program the trainees were each required to submit a written memorandum explaining their interest in a supervisory position and the changes they would implement if awarded that position. *Id.* at p. 22, ¶ 41(b–c). The white trainees were not selected for the supervisory position. Ms. Sanders was advised on January 19, 1999 that she was not selected for a supervisor's position. The position was given to the Hispanic member of their class. (Exhibit 34, Sanders, 97:1–100:1, 102:1–103:5).

A month earlier Ms. Sanders had applied for the position of a labor relations affirmative action specialist, and was allegedly told that her paralegal degree would be an asset in the job. However, the position was given to a white female security guard from OPPD's Fort Calhoun facility. Ms. Sanders alleges that she was more qualified for the position but was denied the position based on her race. *Id.* at p. 22 ¶ 41(d); Exhibit 34, Sanders, 103:6–104:18. She testified that the position was awarded to the daughter-in-law of a former OPPD manager on the basis of nepotism. (Exhibit 34, Sanders, 105:12–24, 11:14–112:24). Ms. Sanders resigned because she felt her education was not being used and she was not advancing at OPPD. *Id.* at 83:23–84:25.

Contrary to Ms. Sander's allegations in the Amended Complaint that she was denied cross-training opportunities, (*id.* at p. 24 ¶ 41(c)), she testified that she was never denied training or cross-training opportunities and was encouraged to participate in further training. (Exhibit 34, Sanders, 30:12–24, 34:21–35:14, 42:6–48:9, 56:4–57:8, 110:18–111:18, 116:21–25, 129:23–130:5). She testifies that she received unequal pay for equal work, but this allegation refers only to the 1994 circumstance where, in order to be transferred to the downtown location, she had to accept less pay and a demotion. *Id.* at 107:15–108:11.

Ms. Sanders could not identify any specific OPPD policy which she believed had adversely impacted African American employees. She states, however, that OPPD has a practice of not promoting black employees into higher paying positions. *Id.* at 109:7–110:17, 122:18–124:13. Ms. Sanders is not currently employed by OPPD, and through her individual claims, seeks compensatory damages for back pay, pain, suffering, and emotional distress. *Id.* at 125:24–127:19.

### 3. Lelia Johnson

Ms. Lelia Johnson alleges discrimination in compensation, (filing 33, Amended Complaint at ¶¶ 11, 43(a-b)), and promotion. *Id.* at ¶ 43(c). She also alleges experiencing and observing racial discrimination in "work assignments, training opportunities, [and] performance evaluations. . . ." (filing 33, Amended Complaint at ¶ 43), and that the defendant failed to provide her with cross-training opportunities. *Id.* at ¶ 44(c).

Ms. Johnson began working for the defendant in 1967, and is currently a Personnel Clerk IV in the labor relations division of the human resources department. (Exhibit 35, Johnson, 12:23–13:4; 145:8–16). She alleges that three white secretaries, who were no more and perhaps less qualified, with less seniority, were transferred into the department, paid more and promoted ahead of her. Filing 33, Amended Complaint at ¶ 43. She does not know the prior background or experience of the three white secretaries who entered her department. Ms. Johnson filed a charge of discrimination with the EEOC

and believes she was promoted only as a result of that filing. She is currently satisfied with her position as Personnel Clerk IV at OPPD. (Exhibit 35, Johnson, 143:10–148:21, 160:4–11, 161:21–162:24, 171:24–172:9, 174:19–22). She has always been paid within the pay ranges set by her collective bargaining agreement. *Id.* at 161:4–20.

Ms. Johnson seeks compensatory damages for back pay and pain and suffering. *Id.* at 168:1–169:4. Although she has not spoken with any African American employees other than the named plaintiffs regarding their treatment at OPPD, she believes she would be an appropriate class representative because she knows of the discriminatory treatment of other employees. *Id.* at 169:9–18, 171:2–12. She has filed a charge of discrimination with the EEOC, and obtained a notice of her right to sue. (Filing 33, Amended Complaint, attached Ex. A.).

### 4. Georgianna Brown

Named plaintiff Georgianna Brown has worked for OPPD since 1968 and is currently a stenographer in software engineering project and information technology. She alleges discrimination in compensation and performance evaluations, and the use of coercive tactics by the defendant during the performance evaluation process to obtain her acquiescence to unfair evaluations and the lack of merit pay increases. (Filing 33, Amended Complaint, ¶¶ 12, 47(f-g)). She also alleges that she has experienced and observed racial discrimination in "promotions, work assignments, [and] training opportunities...." *Id.* at ¶ 46. She claims this discrimination caused emotional distress and health problems, (*id.* at ¶ 46(i)), and states that the stress she has experienced since her employment with OPPD began has caused her persistent problems with high blood pressure, glaucoma, excessive weight, and diabetes. (Exhibit 36, Brown, 40:10–13, 130:5–133:18).

In June and July 1997, Ms. Brown applied for two separate posted division secretary positions with the company, but was not interviewed for either position. She did not file any suit alleging a violation of Title VII, and the statute of limitations now bars such actions. Both positions were awarded to white employees. Ms. Brown does not know their work experience or job qualifications. Although she alleges unsuccessfully applying for ten other "clerk" positions, she can provide no details as to when these applications occurred, what the positions were, or who ultimately obtained them. None was management or supervisory position. (Filing 33, Amended Complaint ¶ 46(a-e); Exhibit 36, Brown, 144:2–4, 145:18–149:12, 153:1–154:12).

At least as early as 1978, Ms. Brown used significant sick leave every year. From June 1994 through January 1999, Ms. Brown used substantially more than 200 hours annually for sick leave, and consistently exceeded the average amount of time per month used for personal phone calls. These problems were routinely noted as "needs improvement" in the work reliability/dependability category of her performance evaluations, nearly all of which Ms. Brown refused to sign. She alleges that OPPD used unfair and coercive practices in providing these evaluations. Ms. Brown defines unfair and coercive to mean downgrading African Americans for absenteeism while overlooking the same issue with white employees, and commenting on every mistake but refusing to recognize the accomplishments of African American employees. (Exhibit 36, Brown, 113:1–124:1, 183:14–188:15, 207:10–208:2). Ms. Brown admits that if her rating for reliability and dependability were correct, it should adversely affect her progress within the company. *Id.* at 143:4–7. She believes, however, that so long as her sick leave does not exceed the amount permitted under the union agreement, it should not be considered in evaluating her reliability and dependability. *Id.* at 41:5–42:10.

Ms. Brown alleges that due to racial discrimination, she is not given equal pay for equal work. Filing 33, Amended Complaint, ¶ 47(f). At all times she has been paid within the rates established under the union agreement, and has currently reached the top pay rate allowed under that agreement for the job she performs. She claims that based on racial discrimination, OPPD has failed to give her merit increases while giving such increases to white women, but she has no knowledge of the performance evaluations

they have received. *Id.* at 155:24–156:4, 158:8–15, 159:23–161:11, 203:2–5.

Ms. Brown seeks compensatory damages for back pay, her pain and suffering, and for emotional distress. She states that she is an appropriate representative for all African American employees in the class because through discussions with other members of the class, she hears and can relate to the same complaints of unfair treatment.

## 5. *Shawn Moore*

Named plaintiff Shawn Moore alleges discrimination in promotions. Filing 33, Amended Complaint, ¶ 13. She alleges that she has experienced and observed racial discrimination in "work assignments, training and compensation." *Id.* at ¶ 49. Her compensation claims relate specifically to an event in the early 1990's, beyond the applicable statute of limitations. She also alleges that OPPD failed to provide her with cross-training, but in her testimony states that she was not denied training or cross-training on the basis of race. *Id.* at ¶ 50(c); Exhibit 37, Moore, 112:13–24, 123:14–124:2. Her claims are therefore limited to the area of promotion.

Ms. Moore works in the Accounts Payable department and began her employment in that department in October 1989. She alleges that in 1993/1994, there was an opening for the position of supervisor/coordinator for that department, but that contrary to OPPD's policy, the position was not posted. A white woman, Ms. Davis, was appointed to the position. It was explained to Ms. Moore that Ms. Davis was appointed because she had a college degree. Ms. Moore believes that the degree was in physical therapy. *Id.* at ¶ 49(a–b).

Ms. Moore alleges that when the position was again open in March 2000, it was posted and Ms. Moore applied. Her application was rejected in favor of a white customer service employee who Ms. Moore asserts was less qualified for the job. *Id.* at ¶ 49(c).

Although she alleges discrimination in training, compensation, work assignments and promotions, Ms. Moore testified that allegations of failing to provide African Ameri-

cans with training opportunities in the same manner and to the same extent as those provided to whites do not apply to her. Exhibit 37, Moore, 112:13–24. Her only allegation of discrimination in compensation relates to not obtaining a position in payroll in the early 1990s. Other than that circumstance, she does not believe she has suffered compensation discrimination. She was encouraged to obtain additional training and to take college courses in accounting, but she chose not to do so. The position she applied for in 2000 was given to someone with an accounts payable and an accounting background who had previously been a supervisor in the accounts payable department. Claims of slower advancement and unfair evaluations do not apply to Ms. Moore. Exhibit 37, Moore, 88:1–89:1, 92:15–93:25, 100:11–102:18, 111:7–12, 112:13–24.

Ms. Moore does not identify any specific OPPD policy or practice which she believes has resulted in discrimination. *Id.* at 114:11–21. However, she believes she was not promoted due to racial discrimination. *Id.* at 115:14–116:12. Ms. Moore seeks compensatory damages for back pay, pain, suffering, and emotional distress. *Id.* at 118:7–119:7.

## 6. *John Smith*

Named plaintiff John Smith did not file a claim with the EEOC, was only recently added as a plaintiff in this action, and now seeks to represent the class. The Amended Complaint alleges that in 1993, Mr. Smith applied for the position of Radiation Protection Technician, but the position was given to a white employee who was no more qualified than Mr. Smith. The amended complaint further alleges that he was then demoted. The Amended Complaint also states that Mr. Smith experienced racial discrimination in seeking a promotion to the position of Radiation Protection Technician at OPPD's Ft. Calhoun facility. The allegations state that less qualified white relatives of current supervisors at OPPD were chosen to fill two openings for this position. Filing 33, Amended Complaint, ¶ 14. Mr. Smith also alleges discrimination in work assignments and training. *Id.* at ¶ 51. However, as discussed below, his deposition is contrary to these

allegations and refutes any claim of racial discrimination within the applicable time frame of this suit.

In July 1993, the position of radiation protection technician was posted. Mr. Smith applied for the position, but did not receive it. It is unclear whether, at the time of this application, he had completed the requisite non-ANSI training to qualify for the position. By May of 1994, however, this training had been completed and Mr. Smith was promoted to the position of radiation protection technician. The position had not been posted. After obtaining this position, in order to further progress, Mr. Smith needed to complete "18.1 training," also referred to as "ANSI training." (Exhibit 38, Smith, 70:8–71:10, 75:3–76:15, 141:13–24).

Although he had received the promotion into a technician position, he was not working with the ANSI technicians and receiving on-the-job training in that area, but instead was doing plant clean up and housekeeping in contamination control. *Id.* at 73:22–74:18. He also did not participate in the ANSI training and testing. In January 1995, he was demoted to a helper position. Mr. Axtell[6], Mr. Christensen, a white male and the brother of another technician, and Ms. Steele, a white female and the wife of an OPPD supervisor, were also demoted to helper positions sometime in 1995. Mr. Christensen and Ms. Steele had taken the ANSI training and had each failed the test twice. None of these demoted employees, including Mr. Smith, experienced a pay cut as a result of the demotion. *Id.* at 77:1–81:6, 91:2–10, 93:9–15, 139:19–140:10.

Mr. Smith believes he was denied training in 1993 and 1994 that could have assisted him in maintaining the technician position he held. *Id.* at 87:5–23. When he asked why he was not being provided the necessary training, he was told, "We can't afford to send you right now, because we need you here in the plant." *Id.* at 87:24–88:15. Mr. Smith initially stated that he believes his demotion in 1995 was based on race, but later, when asked if the demotion was race-related testi-

fied, "Some part of me wants to say yes and some parts I want to say no." *Id.* at 111:24–112:10. He does not believe that he was denied training and testing based upon his race. *Id.* at 88:16–19, 102:10–21.

In November 2000, Mr. Christensen and Ms. Steele again became radiation protection technicians. These employees had more departmental seniority than Mr. Smith. They then obtained the ANSI training, took the test and passed. *Id.* at 93:6–8, 94:6–95:10, 140:11–23. The positions were not posted, but Mr. Smith knew the department was short-staffed and did not express an interest in obtaining a radiation protection technician position, in part because he believed the company would hire an experienced person from outside the company and in part because he was concerned he would fail the ANSI test after he obtained the position and then be terminated. *Id.* at 119:15–122:4. When Mr. Christensen and Ms, Steele obtained the positions, he filed a grievance with the union objecting to these promotions, but never raised race as a basis for the grievance. Since there was no bypass of the seniority system in awarding the positions to Mr. Christensen and Ms. Steele, the grievance was denied without a hearing. *Id.* at 97:13–99:23. Mr. Smith believes the promotions of these employees was the result of nepotism. He does not believe the decision was based on race. *Id.* at 103:2–8, 124:22–125:2, 138:1–17. His applications for other positions within OPPD have been rejected, but he does not believe those decisions were based on race. *Id.* at 105:10–13.

Mr. Smith is not asserting that he was discriminated against on the basis of race in obtaining promotions, performance evaluations, compensation, bettering himself within the company, or lateral transfers. *Id.* at 115:21–116:23, 118:14–17. The amended complaint alleges, "[u]pon information and belief, no African American employee has ever been given the chance to take the Radiation Protection Technician training course." Filing 33, Amended Complaint ¶ 51(c). Mr. Smith readily admits that this allegation is

---

**6.** Mr. Axtell's race is unknown, although he may be African American. (Exhibit 38, Smith, 90:25–91:1, 112:19–113:18, 130, 12–23.)

no true and names African American employees who have taken the training. *Id.* at 119:4–14.

## II. The Class Definition

The testimony and allegations of the named plaintiffs are "challenging Defendant's policies and practices related solely to promotions, compensation, training and evaluations, all of which were and are subjectively implemented by Defendant." Plaintiffs' reply brief at p. 7. The named plaintiffs seek to represent all African Americans who have encountered such racial discrimination while performing work for OPPD from October 1996 to present. If the scope of the class has been correctly identified, there are likely more than 150 members of this group. See, Exhibit 2, affidavit of Dana E. Christian, attachment D.

However, the scope of the class has not been correctly identified. The class, as identified, would include both management and non-management employees with claims beyond the statute of limitations for plaintiffs' § 1981 and Nebraska Fair Employment Practices Act (NFEPA) claims, and those with claims arising prior to the time frame of the EEOC charges filed by the named plaintiffs.[7]

Several courts have held that where the class alleges that the policies and practices of supervisory employees are discriminatory and hinder the promotion, advancement, and compensation of non-supervisory employees, supervisory and non-supervisory employees may not be placed in the same class. *Wells v. Ramsay, Scarlett & Co., Inc.*, 506 F.2d 436 (5th Cir.1975) (salaried employee who supervised longshoremen and severed his union membership could not serve as class representative); *Grant v. Morgan Guaranty Trust Co.*, 548 F.Supp. 1189 (S.D.N.Y.1982) (serious and substantial conflict of interest exists between managers who process promotions and employees who apply for them); *Berggren v. Sunbeam Corp.*, 108 F.R.D. 410, 411–412 (N.D.Ill.1985) (representation of supervisory and nonsupervisory personnel, union and

nonunion employees, in discriminatory promotion claim would present a different set of facts for each employee and not common questions of law or fact); *Sperling v. Donovan*, 104 F.R.D. 4, 7 (D.D.C.1984) ("It is generally true that supervisory and non-supervisory employees may not be placed in the same class.") "Inherent problems exist with combining union and non-union employees within one class." *Moses v. Avco Corp., Avco Lycoming Div.*, 97 F.R.D. 20, 24 (D.Conn.1982).

The plaintiffs in this case have not shown that the policies and practices OPPD applies to employees exempt from collective bargaining agreements are also applicable to employment decisions for employees who are subject to such agreements. In *Wakefield v. Monsanto*, 120 F.R.D. 112, 117 (E.D.Mo.1988), the court held that a non-exempt employee cannot show the commonality or typicality requirements necessary to qualify her as a class representative for both prospective non-exempt and exempt class members alleging racial discrimination in pay and promotion. This representative's claim of discrimination in obtaining a promotion to management was not typical of the claims asserted by those who have already received the benefit of management promotion but wished to further advance. See also, *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C.Cir.1987) (although supervisor's claims of promotion discrimination based on race may share typicality with that of be typical of nonsupervisory personnel also alleging such discrimination, he could not represent class because the interests of nonsupervisory personnel had been and were likely to continue being antagonistic to the supervisor class members).

Placing OPPD management and the employees they supervise in the same class appears to create an inherent conflict of interest within the class. The record in this action reveals that OPPD supervisors train and evaluate employees, and compensation and advancement decisions may be based on these evaluations. There are African Ameri-

7. The discrimination charges filed with the EEOC were not part of the court record but are discussed in the depositions of 5 of the 6 named plaintiffs. There is no evidence or allegation that named plaintiff John Smith ever filed an EEOC charge of discrimination.

can management employees within OPPD's human resources department, which provides guidance and input on promotion and placement of both exempt and non-exempt (union) OPPD employees. It is quite foreseeable that the non-exempt employees within the class who are asserting racial discrimination in pay, evaluations, training, and promotion will be challenging the conduct of some of the black exempt employees within the class, who would then be forced to defend the very conduct their class claims to be challenging. This conflict requires separating exempt and non-exempt employees into separate classes to assure adequate representation of the class. See, *Morgan v. United Parcel Service of America, Inc.*, 169 F.R.D. 349, 357 (E.D.Mo.1996) (plaintiff who was a "center manager" could not represent employees below that level who were asserting that defendant systematically promoted black salaried employees more slowly and in smaller numbers than white salaried employees).

The plaintiffs' proposed class would include all African American employees who have performed work for OPPD since October 1996. In resolving questions of whether a class can be defined, factors such as the breadth of the jurisdictional base and the statute of limitations must be assessed. *Cervantes v. Dobson Bros. Const. Co.*, 1977 WL 89 (D.Neb.1977) (Urbom, J.). The class representative must have filed an EEOC charge in order to have standing to raise a Title VII action on behalf of the class. *Briggs v. Anderson*, 796 F.2d 1009, 1018 (8th Cir.1986). Relief for claims of discrimination in job assignment, promotion, pay, performance evaluations, and training extends to the beginning of the limitations period. Where the named plaintiffs have filed their charges with an appropriate the state agen-

cy, the limitations period extends 300 days prior to the filing of the charge.[8] *Robinson v. Sears, Roebuck and Co.*, 111 F.Supp.2d 1101, 1116 (E.D.Ark.2000).

The timely filing of a named plaintiff's discrimination charge in a class action may satisfy the charge obligation of all members of the class if the "piggybacking" rule is applicable. Specifically, if the charge of a class representative being relied upon is timely and not otherwise defective, and the individual claims of the filing and non-filing plaintiffs have arisen out of similar discriminatory treatment in the same time frame, class members who have not filed a charge of discrimination are allowed to pursue their claims as part of the class action. *Id.*

In this case the named plaintiffs' actual charges of discrimination before the NEOC and the EEOC are not part of the court record, but their content was discussed in the depositions of these parties.[9] This testimony indicates that the individual claims of one or all of the named plaintiffs sufficiently raise issues of discrimination in promotion, compensation, training and performance evaluations. These charges therefore encompass the alleged class-wide discriminatory treatment at issue in this lawsuit. *Id.* The time frame for the plaintiffs' Title VII class claims must begin no earlier than 300 days prior to the earliest filing of a charge by any class representative. *Id.*

The earliest filing of a charge of discrimination by an exempt employee was on March 31, 1999, and by a non-exempt employee on March 23, 1999.[10] Therefore, for all Title VII claims, the class of exempt employees is limited to those whose claim arose on or after June 4, 1998; Title VII claims for the non-

---

8. Under 42 U.S.C. § 2000e–5(e)(1), a plaintiff who files with a state Equal Opportunity Commission, such as the NEOC, will have 300 days, rather than 180 days, in which to file a charge of discrimination.

9. The notice of right to sue letters received by the named plaintiffs, other than John Smith, are filed as an attached Exhibit A to the Amended Complaint.

10. Mr. Clayborne filed a charge of discrimination with the Nebraska Equal Opportunity Commis-

sion and the EEOC on March 31, 1999, (Exhibit 33, Clayborne, 137:3–16, 142:12–143:1). The non-exempt named plaintiffs filed their charges of discrimination with the NEOC and EEOC as follows: Angela Sanders on March 23, 1999, (Exhibit 34, Sanders 86:15–87:13); Lelia Johnson on March 29, 1999, (Exhibit 35, Johnson, 140:6–141:12); Georgianna Brown on March 30, 1999, (Exhibit 36, Brown, 124:5–10); and Shawn Moore on September 26, 2000, (Exhibit 37, Moore, 78:23–80:2).

exempt employee class must have arisen no earlier than May 28, 1998.

Under Nebraska law "[a]ll actions upon a liability created by a federal statute, other than a forfeiture or penalty, for which actions no period of limitations is provided in such statute shall be commenced within three years next after the cause of action shall have accrued." *Neb.Rev.Stat.* § 25–219 (1995). Section 25–219 is the appropriate statute of limitations applicable to section 1981 claims. *Metcalf v. Omaha Steel Castings Co.,* 476 F.Supp. 870, 873 (D.Neb.1979). This suit was filed on October 18, 2000. Therefore, claims arising prior to October 18, 1997, that is, more than three years prior to the date that plaintiffs filed their lawsuit, cannot be asserted in this case.

Therefore, the class of exempt employees, if any is to be defined, must not include persons whose Title VII claims arose before June 4, 1998 and whose § 1981 claims arose before October 18, 1997. The non-exempt employee class, if any is to be defined, must not include persons whose Title VII claims arose before May 28, 1998 and whose § 1981 claims arose before October 18, 1997. See, *Robinson,* supra.; *Beckmann v. CBS, Inc.,* 192 F.R.D. 608, 616 (D.Minn.2000); *Cervantes,* supra.

The defendant has argued that the class must also be divided into subclasses related to the specific areas of discriminatory conduct. Specifically, the defendant claims there must be a subclass for each of the following: promotion, performance evaluation, compensation and training. *Falcon* held that a plaintiff alleging that he had been discriminatorily denied a promotion was not a proper representative for a class claim of discriminatory hiring practices, (*Falcon,* 457 U.S. at 158, 102 S.Ct. at 2371). The Eighth Circuit has also noted that hiring and promotion are usually very independent employment practices. *Craik v. Minnesota State University Bd.,* 731 F.2d 465, 480 n. 20 (8th Cir.1984). In contrast, claims arising after employment has begun, such as promotion and compensation discrimination, are very interrelated. An individual plaintiff who has been denied a promotion on the basis of race can pursue promotion and compensation claims on behalf of the class. *Id.* Under this reasoning, plaintiffs' claims of discrimination in promotion, compensation, training, and performance evaluation are sufficiently interrelated that they need not be asserted by distinct subclasses. *Id.*

## III. Rule 23(a)

The definition of the putative class provides the backdrop for assessing the issues of numerosity, commonality, typicality, and adequacy of representation. Assessing these Rule 23(a) factors requires analyzing interrelated facts which may tend to prove or disprove more than one of the Rule 23(a)'s prerequisites.

### 1. Numerosity

The numerosity requirement of Rule 23(a)(1) requires consideration of the number of persons in the proposed class, the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members. No uniform rules regarding the necessary size of classes have been established. *Paxton,* 688 F.2d at 559–60. The numerosity requirement of Rule 23(a)(1) may not be met if the number of potential class members is small, they lack geographic diversity, and they seek both compensatory damages and injunctive relief. *Roundtree v. Cincinnati Bell, Inc.,* 90 F.R.D. 7, 9 (S.D.Ohio 1979). See also, *Morgan,* 169 F.R.D. at 355 ("Geographical dispersion is a factor that may establish impracticability even in a relatively small putative class."). Further, where a class is divided into subclasses, numerosity is evaluated for each subclass, (see, e.g., *Wakefield,* 120 F.R.D. at 114), and the size of the class is limited to those whose claims fall within the applicable statute of limitations. See, e.g., *Caviness,* 61 Fair Empl. Prac. Cas. (BNA) 1634, 1993 WL 330648 (size of class limited to those whose claims arose within 180 days prior to named plaintiff's EEOC charge).

For the class of all exempt employees as defined above, the plaintiffs have not proven that based on size, or any other fac-

tor, joinder of all members is impractical. The plaintiffs have not presented evidence of the number of exempt African American employees who have worked for OPPD after October 18, 1997. The plaintiffs' listing of African American employees of OPPD dates back to January 1, 1995, even prior to plaintiffs' class definition date of October 1996. With few exceptions, the job titles identified on the listing of African American employees do not adequately inform the court as to whether the position is an exempt or union position. (See, Exhibit 2, affidavit of Dana Christian, attached Exhibit D). Likewise, the twenty-five employee affidavits do not identify whether the affiant is an exempt or non-exempt employee, and some of these affidavits are offered by employees who have not worked for OPPD since October 18, 1997.[11] The plaintiffs have offered the testimony of Robert Guy to prove that in 1999, there were only two African Americans in the position of senior management or manager/supervisor. Exhibit 29, Guy, 49:13–50:15. The geographical distance of potential class members does not tend to prove that joiner is impractical. None of OPPD's facilities at issue in this case extend beyond the State of Nebraska and this court's jurisdiction. The plaintiffs have therefore failed to prove that joinder of all exempt African American employees who have worked for OPPD since October 17, 1997 is impractical.

■ In contrast, while the listing of African American employees of OPPD dating back to January 1, 1995 is not restricted to union (non-exempt) employees, 197 employees are listed and twenty-seven of those employees were hired after October 17, 1997.[12] In addition, given the likely ratio of management to union employees, it is reasonable to assume that the majority of OPPD's employees are non-exempt, including the black employees listed in the exhibit D attachment to the affidavit of Dana Christian. It is also

reasonable to assume that many of those listed as hired before October 1997 remained employed with OPPD after that date. This evidence is sufficient to prove that the class of all non-exempt African American employees of OPPD would exceed, at the least, 50 members, making joinder of these members as parties impractical.

### 2. & 3. Commonality and Typicality

The analysis of commonality, typicality, and adequacy of representation requires a discussion of often overlapping facts.

The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. at 2371 n. 13.

■ In suits alleging racial discrimination, relevant factors which a court may consider in determining whether the commonality requirement is met include:

(i) the nature of the employment practices charged;

(ii) the uniformity or diversity of the employer's employment practices;

(iii) the uniformity or diversity of the class membership; and,

(iv) the nature of the employer's management organization.

*Wakefield,* 120 F.R.D. at 116.

■ Proving typicality requires "a demonstration that there are other members

---

11. See, Exhibit 6, affidavit of Eddie J. Edwards, resigned February 1996; Exhibit 9, affidavit of Alonzo D. Guliford, terminated on May 31, 1996; Exhibit 23, affidavit of Lawrence Swan, retired in 1996; Exhibit 27, affidavit of Barbara Wooten–Tilman, retired in 1995.

12. Two of these hires are Division Manager positions, which according to the testimony of Mr. Clayborne, are exempt positions. The testimony of Gloria Guillard verified that Rubin Carter, Division Manager of Human Resources, is an exempt employee. Of the remaining hires since October 1997, most appear to be union positions, although the status of some is unclear.

of the class who have the same or similar grievances as the plaintiff." *Paxton*, 688 F.2d at 562. The typicality requirement is not always satisfied by suits alleging broad-based racial discrimination. To assess typicality in a race discrimination suit, a court must determine whether a sufficient "community of interests" exists to make plaintiff's claim typical of the class he or she seeks to represent by comparing:

> (i) plaintiff's employment situation and that of the prospective class members;
>
> (ii) the circumstances surrounding plaintiff's grievance and those surrounding the prospective class members' grievances; and,
>
> (iii) the relief sought by plaintiff and that sought by the class.

*Wakefield*, 120 F.R.D. at 116.

The analysis of these factors in this action against OPPD reveals insufficient evidence to "bridge the gap" between the named plaintiffs' individual claims of discrimination, their assertion that this is typical of the promotion practices which pervade through all divisions of OPPD, and their contention that these practices are motivated by racial discrimination. *Falcon*, 457 U.S. at 157–58, 102 S.Ct. at 2370–71. Although "racial discrimination is by definition class discrimination," (*id.* at 157, 102 S.Ct. at 2370), an individual's allegation of racial discrimination "neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." *Id.*

> There is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [plaintiff] to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were

advanced may support the conclusion that respondent was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of [the employer's] promotion practices, (2) that [the employer's] promotion practices are motivated by a policy of ethnic discrimination that pervades [employer's] division, or (3) that this policy of ethnic discrimination is reflected in [the employer's] other employment practices, such as hiring, in the same way it is manifested in the promotion practices.

*Falcon*, 457 U.S. at 157–58, 102 S.Ct. at 2370–71. Under *Falcon*, the focus is on discriminating employment practices, not on an abstract policy of discrimination.

"The inquiry regarding an individual's claim is the reason for a particular employment decision, while 'at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.'" *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (citing *Teamsters v. United States*, 431 U.S. 324, 360 n. 46, 97 S.Ct. 1843, 1867 n. 46, 52 L.Ed.2d 396 (1977)). "A class plaintiff's attempt to prove the existence of a company-wide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved." *Cooper*, 467 U.S. at 877–78, 104 S.Ct. at 2800 (discussing *Falcon*). In order to make out a case of classwide employment discrimination, the named plaintiff must prove that "the defendant engaged in a pattern or practice of unlawful discrimination in various company policies, that 'discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" *Briggs*, 796 F.2d at 1019 (citing *Craik*, 731 F.2d at 468 n. 5) (quoting *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855).

The plaintiffs argue that OPPD has facially neutral policies, but that it does not follow these policies in determining promotions and that even when followed, these policies were applied in a racially discriminatory manner,

or that the policies disparately impacted African American employees. (Plaintiffs' brief at p. 10). The plaintiffs also argue that OPPD has a policy of permitting subjective decision-making by individual managers which has resulted in racial discrimination in promotion, compensation, performance evaluations, and training. Plaintiff's reply brief at p. 7.

Therefore, the scope of plaintiffs' claims is very broad and encompasses both disparate treatment or disparate impact claims. Although establishing commonality or typicality under a disparate treatment theory is more difficult than doing so under a disparate impact claim, "[s]tatistical evidence often plays a vital role in establishing class-wide discrimination under a disparate treatment theory as well, and if sufficiently strong and compelling, it may establish discrimination by itself." *Reid*, 205 F.R.D. at 667. Additionally, plaintiffs may offer anecdotal evidence to bolster their claims of disparate treatment and disparate impact. *Id.* (citing *In re Employment*, 198 F.3d 1305, 1312 (11th Cir. 1999)).

■ The plaintiffs have submitted OPPD's 1999 utilization summary as statistical evidence in support of their motion. Exhibit 2, affidavit of Dana E. Christian, ¶ 4 and attachment B. Although they request prospective relief on behalf of the class, they have not submitted the most recent OPPD utilization summaries. This exhibit is not discussed in plaintiffs' briefs, but does reflect that in 1999, of the 137 senior management and manager/supervisor positions within OPPD, only two were held by African Americans. Exhibit 29, Guy, 49:13–50:15. The exhibit also addresses hiring and transfer statistics which are not part of this motion for class certification, but it does not reference the issues of comparable pay, training, or performance evaluations which were raised by the plaintiffs' motion. Its significance for this motion is therefore limited to plaintiffs' claim of class-wide discrimination in promotions.

In accordance with federal law, the utilization summary is provided annually by OPPD to the Office of Federal Contract Compliance Programs (OFCCP) for its review of OPPD's employment practices and potential underutilization of minority employees. However, the computations of the utilization summary do not set forth the OFCCP's ultimate assessment of adverse impact. That agency uses the Impact Ratio Analysis and the Adverse Impact Analysis to determine if actual hiring and promotion disparities exist which have had an adverse impact on minorities employed by or seeking employment with OPPD. The 1998, 1999, and 2000 Adverse Impact Analysis studies performed on OPPD's documentation and statistics reflected that, as to promotions, the OFCCP found no selection process or criteria used by OPPD had created an adverse impact on African Americans. Exhibit 39, affidavit of Carl J. Olsen, ¶¶ 9–19, Exhibits 40, 41 and 43. Further, the Department of Justice's investigation of OPPD's employment practices, which began in 1992, was closed in 1997, with no policy or practice of racial discrimination identified. Exhibit 39, affidavit of Carl J. Olsen, ¶ 17, Exhibit 42.

■ While the determination of the OFCCP and the Department of Justice are not binding on this court, plaintiffs' mere recitation of one computation from the raw data is not sufficient evidence to meet their burden of proving adverse treatment or impact, or that the findings of the Department of Justice and OFCCP were incorrect. See, *Reid*, 205 F.R.D. at 660 (refusing to certify class in racial discrimination suit by union employees against federal defense contractor subject to executive oversight although plaintiffs offered expert testimony analysis of statistical data to prove discrimination.) "Statistics laying bare a racially unbalanced workforce do not make out a prima facie case of disparate treatment absent further evidence drawing comparisons with the relevant labor market. Much less do they show a policy of discrimination manifested in the employer's promotional practices." *Wagner*, 836 F.2d at 593 (statistics of racially unbalanced workforce "fell short of the mark" of proving commonality).

■ The anecdotal evidence offered by plaintiffs is also insufficient to support a claim of class-wide discrimination. The plaintiffs have submitted twenty-seven affida-

vits, twenty-five of which were provided by current and past employees of defendant, and over 450 pages of deposition testimony in support of their motion.[13] These affidavits describe individual claims from employees with diverse jobs and job skills working in several locations, for differing supervisors, and with different assertions of discriminatory conduct. The plaintiffs state that these affidavits, as a whole, establish:

1. The named plaintiffs and "the prospective class members have suffered from the same disregard of company policies;" (Plaintiffs' brief at p. 10),

2. The "facts stated in the affidavits of potential class members ... demonstrate not only that a series of questions of law are common among class members and the Named Plaintiffs, but also that there is a 'common nucleus of operative facts' which affects all class members;" (Plaintiffs' brief at p. 12.),

3. The prospective class members and the named plaintiffs "have been subjected to the same treatment" in terms of unequal employment promotions, pay, training, and performance evaluations; (Plaintiffs' brief at p. 13),

4. [T]hese practices and policies of Defendant "have been applied on a racial basis with uniform application to all African American employees of Defendant." (Plaintiff's brief at p. 13),

5. The named plaintiffs "have the same or similar grievances as the prospec-

tive class members;" (Plaintiffs' brief at p. 14).

With the exception of named plaintiff John Smith, the named plaintiffs and all the affiant employees claim disparate treatment based on racial discrimination in obtaining promotions within OPPD. The policies or practices identified by plaintiffs and allegedly causing this discrimination include OPPD's alleged failure to post positions or openings so that every employee had an opportunity to apply, (Exhibit 5, affidavit of Howard Dixon, Jr., Exhibit 6, affidavit of Eddie J. Edwards, Exhibit 7, affidavit of Vivyonne Ewing, Exhibit 13, affidavit of Grenal Jackson, Jr.), and OPPD's alleged policy of deciding whom to promote by using totally subjective decision-making.

The anecdotal evidence, combined with the testimony of the named plaintiffs, does not support concluding that the requisite commonality and typicality exist with reference to posting job openings. Only four of these affidavits mention losing, or contain generalized statements that others have lost opportunities for promotion due to the failure to post openings.[14] The vast majority of the affiant employees relate applying for a position, or seeing others apply for a position, and not being awarded the promotion due to discrimination.[15] Of the named plaintiffs, Mr. Clayborne and Ms. Moore allege positions were not posted, Ms. Brown complains that she was not awarded posted positions, and Mr. Smith was promoted into an unposted position. This evidence is insufficient to show that African Americans were commonly denied an opportunity to apply for pro-

---

**13.** None of the affidavits is from a named plaintiff. Although stating that the affidavits would be referenced as "Affidavit of ___ at ¶ ___," (plaintiff's brief at p. 5), the twenty-five employee affidavits are never specifically referenced as supporting any particular issue. Rather, Plaintiffs' use of a broad brush to explain highly detailed and voluminous evidence has significantly complicated the required "rigorous analysis" of this case, and has unnecessarily increased the time expended to perform that review.

**14.** See, Exhibit 5, affidavit of Howard Dixon, Jr. ¶ 10; Exhibit 6, affidavit of Eddie J. Edwards, ¶ 7; Exhibit 7, affidavit of Vivyonne Ewing, ¶ 6; Exhibit 13, affidavit of Grenal Jackson, Jr., ¶ 8.

**15.** See, Exhibit 3, affidavit of Deborah Carter; Exhibit 4, affidavit of Rissa Conner; Exhibit 8,

affidavit of Joe M. Grimes; Exhibit 9, affidavit of Alonzo D. Guliford;Exhibit 10, affidavit of Carol A. Gunn; Exhibit 11, affidavit of Estella Hawkins; Exhibit 12, affidavit of Rodney A. Hayes; Exhibit 14, affidavit of Barbara D. Lewis; Exhibit 15, affidavit of William A. McGee; Exhibit 16, affidavit of Roxana L. Morrow; Exhibit 17, affidavit of Richard D. Nettles; Exhibit 18, affidavit of Sidney Perry; Exhibit 20, affidavit of Rod Rogers; Exhibit 21, affidavit of Rodney Rose; Exhibit 22, affidavit of Mary Steen; Exhibit 23, affidavit of Lawrence Swan; Exhibit 24, affidavit of Vicki A. Webb; Exhibit 25, affidavit of Calvin Webster; Exhibit 26, affidavit of Blondell Winston; Exhibit 27, affidavit of Barbara Wooten–Tilman.

motions because positions were not posted, or that the experiences of the named plaintiffs were typical of the class members' experiences. See, *Caviness*, 1993 WL 330648 at *6 (plaintiff's experience of applying for and not receiving jobs was not typical of those who claimed discrimination because jobs were not posted and hiring was done by "word-of-mouth").

Plaintiffs also state that OPPD engages in a policy or practice of subjective decisionmaking in promoting African American employees which has a racially discriminatory impact. (Filing 33, Amended Complaint, ¶ ¶ 21(i); 38(e), 41(e), 47(e), 50(e) and 52(e)). "Entirely subjective decisionmaking processes" which results in racial discrimination can constitute a policy or practice of discrimination sufficient to certify a class. *Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15. A policy authorizing individual managers to determine promotions at their discretion, with no centralized oversight or directives, may justify a class proceeding if the resulting promotion decisions are racially motivated. *Beckmann*, 192 F.R.D. at 614 (no centralized standards or guidelines for promotions); *Morgan*, 169 F.R.D. at 356 (managers granted "unfettered authority regarding promotions").

The facts before me on this motion, however, do not support a claim of subjective and unfettered discretionary promotion policies, much less that such policies resulted in class-wide discrimination. OPPD's evidence is to the effect that its policy requires division managers to post positions unless the manager, with input and assistance from the human relations department, believes the knowledge, skill, and ability needed for the position already exists within his or her own department, and promoting from within the department is appropriate. When an opening exists, the department manager creates a requisition to hire an employee and submits it through several levels of the corporation, including human resources. OPPD's Manager of Human Resources Information Systems and Employment, Gloria Guillard, an African American, is responsible for reviewing and approving these requisition forms. (Exhibit 28, Guillard, 20:21–25, 68:17–69:6, 212:11–14).

The labor relations affirmative action specialists provide statistical information from the utilization summary concerning whether minorities are underutilized in that position. This information is forwarded to the division manager. The manager works with guidance from the human resources department to make the appropriate selection and appointment. *Id.* at 49:2–11; Exhibit 29, 25:17–30:15; Exhibit 30, Peterson, 53:14–54:25, Exhibit 31, Sorensen, 14:5–18:22, 22:18–23.

Non-exempt employees are also governed by the terms of at least three collective bargaining agreements. Commonality and typicality are difficult to establish with regard to promotion claims of the hourly employees subject to different union agreements. *Reid*, 205 F.R.D. at 671 n. 20. These union agreements provide uncontrolled discretion to the company in the areas of hiring, suspension, discharge, transfer, layoff for lack of work, and discipline, subject to the Union's right to challenge layoffs and discharges as "arbitrary, partial, prejudiced or discriminatory." Filing 52 and Exhibits A and B. These documents do not provide the company with uncontrolled discretion over promotions, however, and any discretion granted to the company does not necessitate a finding that this discretion is subjectively carried out, without company oversight, by individual managers. Plaintiff's evidence is insufficient to establish such subjectivity. See, *Reid*, 205 F.R.D. at 676 (collective bargaining agreements and management directives for salaried positions introduced objective criteria with regard to promotions, which, along with lack of evidence of racial disparity, defeated class certification on basis of subjective decisionmaking); *Webb v. Merck & Co.*, 206 F.R.D. 399, 407 (E.D.Pa. 2002) (while managers use some discretion in making decision, company's decision-making processes with regard to promotion and compensation are based, at least in part, on collective bargaining agreements, and the process is not an entirely subjective policy or practice).

The plaintiffs propose representing employees from every location of OPPD's business, arguing that OPPD's policies and prac-

tices similarly affect all these putative class members. It is uniformly held that plaintiffs seeking class certification may represent a multi-facility class only where centralized and uniform employment practices affect all facilities the same way. *Thompson v. Board of Education,* 709 F.2d 1200 (6th Cir.1983); *Pegues v. Mississippi State Employment Serv.,* 699 F.2d 760 (5th Cir.1983); *Stastny v. Southern Bell Tel. & Telegraph Co.,* 628 F.2d 267, 279–80 (4th Cir.1980); *Reid,* 205 F.R.D. at 668; *Lott v. Westinghouse Savannah River Co.,* 200 F.R.D. 539, 555–56 (D.S.C.2000); *Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230, 238–40 (W.D.Tex.1999); *Morgan,* 169 F.R.D. at 356; *Johnson v. Bond,* 94 F.R.D. 125 (N.D.Ill.1982); *Seidel v. General Motors Acceptance Corp.,* 93 F.R.D. 122, 124–25 (W.D.Wash.1981); *Webb v. Westinghouse Elec. Corp.,* 78 F.R.D. 645, 651 (E.D.Pa.1978).

In this action the named plaintiffs allege that OPPD's policy of allowing subjective decisionmaking permits racially motivated promotion decisions at all its locations. This argument requires the court to assume that individual OPPD managers at all of its facilities are racially biased in making their decisions. There is no evidentiary basis for reaching this sweeping determination of unlawful conduct, and plaintiffs' argument cuts against a finding that a multi-facility class was subjected to common discrimination.

The fact that employment decisions are handled by one's immediate supervisor based on subjective criteria would be useful evidence in an *individual* disparate *treatment* claim, but works against *class certification* of a disparate *impact* claim when the proposed class is subject to the same local autonomy in geographically dispersed facilities.

*Reid,* 205 F.R.D. at 670 (citing *Zachery,* 185 F.R.D. at 238) (emphasis in original).

In addition to the area of promotions, the plaintiffs have also claimed class-wide disparate impact and treatment in training opportunities, performance evaluations, and compensation. These claims are not addressed by any statistical evidence offered by the plaintiffs, and the anecdotal evidence is not sufficient to support class certification.

Regarding training, the majority of the employee affidavits do not discuss a claim that African American employees were denied training opportunities, significantly weakening plaintiffs' allegation that this type of discrimination is common to the class.[16] *Reid,* 205 F.R.D. at 675 (where a significant portion of the affidavits submitted by putative class did not complain of hostile work environment, plaintiffs' assertions of commonality and typicality severely weakened). The affidavits supporting the motion are from employees working at different jobs, different locations, and with varying work backgrounds and experience, with requests for training extending back to the late 1970's. (See, Exhibit 27, affidavit of Barbara Wooten–Tilmon, ¶¶ 6 and 14).

[A]necdotal evidence submitted by Plaintiffs, which describes diverse events concerning different positions and training requests across a broad time period, does not establish commonality and typicality in the absence of evidence tending to link these separate events to a class-wide problem.

*Reid,* 205 F.R.D. at 671. Of the affidavits containing claims of discrimination in training, many contain only broad allegations that white employees were treated better than black employees.[17] These allegations are not

---

**16.** Named plaintiffs Sanders and Moore allege lack of training but testify that they were not denied training. Exhibit 34, Sanders, 30:12–24, 34:21–35:14, 42:6–48:9, 56:4–57:8, 110:18–111:18, 116:21–25, 129:23–130:5; Exhibit 37, Moore, 123:14–124:2. Most of the employee affidavits do not mention the issue of training. See, Exhibit 3, affidavit of Deborah Carter; Exhibit 4, affidavit of Rissa Conner; Exhibit 7, affidavit of Vivyonne Ewing; Exhibit 12, affidavit of Rodney A. Hayes; Exhibit 14, affidavit of Barbara D. Lewis; Exhibit 15, affidavit of William A. McGee; Exhibit 17, affidavit of Richard D. Nettles; Exhibit 18, affidavit of Sidney Perry; Exhibit 20, affidavit of Rod Rogers; Exhibit 21, affidavit of Rodney Rose; Exhibit 25, affidavit of Calvin Webster. One affidavit mentions that training was encouraged so the employee would be eligible for promotion. Exhibit 10, affidavit of Carol A. Gunn. (See also, citations to similar testimony of named plaintiff Sanders set forth above.)

**17.** OPPD has filed evidentiary objections and moved to strike the content of many of the affidavits. See, filing 47. Rulings on each specific objection are not noted in this report and recom-

sufficient to maintain a disparate treatment claim, *Davenport v. Riverview Gardens School Dist.*, 30 F.3d 940, 945 (8th Cir.1994), or support certifying a class. Class certification cannot be based on "general conclusory allegations that unnamed blacks have been discriminated against." *Paxton*, 688 F.2d at 562. Vague statements that training was denied lack sufficient specificity to be probative evidence concerning the number of employees affected by lack of training; the existence of a practice or policy by OPPD to deny employees appropriate training; or the disparate impact on of treatment of African Americans resulting from a policy or practice of denying training.[18]

Like the issue of training, unequal pay is raised as a claim in the amended complaint, but there is insufficient evidence of any OPPD class-wide practice or policy of unfair compensation. Most of the affidavits offered by the plaintiffs do not address the issue of compensation. Of those that have, the claim was raised by employees from differing jobs and locations; who are exempt, from varying unions, or who no longer work for OPPD;

and were often stated as a broad conclusory allegation, lacking foundation, that whites are paid more than African Americans.[19] To the extent that the class is requesting prospective relief, statements made by members who are no longer employees, and who therefore cannot testify concerning current pay and policies, are not relevant. Finally, many of the pay issues are subject to the terms of collective bargaining agreements from more than one union. The anecdotal evidence in the affidavits suggests, at most, individual disagreements with the pay received and not an OPPD policy or practice of providing unequal compensation to African Americans.

Finally, performance evaluations are neither addressed in plaintiffs' statistical evidence nor the anecdotal evidence offered by affidavits. Only named plaintiffs Angela Sanders and Georgianna Brown allege discrimination in performance evaluations, with Ms. Sanders allegations being only broadly stated. The court cannot assume that these allegations, standing alone, represent anything more than these named plaintiffs' individual claims of racial discrimination. Such

mendation, but the probative value of the affidavits is discussed. Although the defendant has also objected to portions of some affidavits of the basis of hearsay, "[h]earsay testimony may be admitted to demonstrate typicality." *Paxton*, 688 F.2d at 562 n. 14.

18. Of the eleven affidavits offered which state that training was denied to blacks, eight of those affidavits contain essentially verbatim statements that the employee observed and experienced blacks being denied training with no specificity as to whether training was requested; the type of training at issue; whether the training was applicable to the employee's assigned job or an area of interest for promotion; when the training denial occurred; or ·the stated reason for denying training. (See, Exhibit 5, affidavit of Howard Dixon, Jr., ¶ 11, 12; Exhibit 6, Exhibit 8, affidavit of Joe M. Grimes; affidavit of Eddie J. Edwards, ¶ 10; Exhibit 9, affidavit of Alonzo D. Guliford, ¶ 11; Exhibit 13, affidavit of Grenal Jackson, Jr., ¶ 7; Exhibit 16, affidavit of Roxana L. Morrow, ¶ 15; Exhibit 23, affidavit of Lawrence Swan, ¶ 8; Exhibit 24, affidavit of Vicki A. Webb, ¶ 10; Exhibit 26, affidavit of Blondell Winston, ¶ 7).

19. See, Exhibit 5, affidavit of Howard Dixon, Jr., line department, (denied access to overtime wages); Exhibit 6, affidavit of Eddie J. Edwards, resigned as a Program Analyst in 1996, (whites

paid more than blacks); Exhibit 7, affidavit of Vivyonne Ewing, resigned form human resources department in 1998 (observed lower starting pay for blacks when promoted); Exhibit 8, affidavit of Joe M. Grimes, Manager of Corporate Security, (lower salary compared to other managers); Exhibit 13, affidavit of Grenal Jackson, Jr., Designer, (paid less than similarly qualified whites); Exhibit 14, affidavit of Barbara D. Lewis, Information Protection Analyst, (second highest seniority but is the lowest paid team member); Exhibit 16, affidavit of Roxana L. Morrow, Remittance Processing Coordinator, (denied fair compensation); Exhibit 19, affidavit of Cathy Price, Programmer/Analyst who terminated her employment in May 1996 and returned un July 2001, (observed other black programmers being denied equal compensation); Exhibit 20, affidavit of Rod Rogers, Security Technician, (promoted to a Security Technician job, which pays less but does the same function as the Engineer); Exhibit 21, affidavit of Rodney Rose, Crew Leader in Underground Construction, Elkhorn, Nebraska, (unequal compensation); Exhibit 23, affidavit of Lawrence Swan, retired in 1996 (unequal pay); Exhibit 24, affidavit of Vicki A. Webb, terminated for tardiness and absenteeism on October 3, 1998, (successfully filed an equal pay claim with the EEOC in 1986. Job responsibilities had increased with no increase in pay); Exhibit 27, affidavit of Barbara Wooten–Tilman, retired from OPPD mailroom in 1995, (no merit raises in 31 years).

evidence is not sufficient to show OPPD engaged in a policy or practice of racial discrimination in performance evaluations. See, *Falcon*, supra.; *Reid*, 205 F.R.D. at 674 (absent statistical information to buttress allegations, affiants' statements of dissatisfaction with performance evaluations, without any factual basis for claiming they were the product of racial animus, insufficient to link personal injuries to the injuries of a class).

The plaintiffs have failed to demonstrate a common grievance of racially disparate treatment or impact resulting from a practice or policy implemented by OPPD, and have failed to show that their personal experiences are typical of the alleged class-wide discrimination in promotion, training, performance evaluations, and compensation. "[A] 'court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless free-standing trees.' " *Cooper*, 467 U.S. at 879, 104 S.Ct. at 2801 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 934, 102 S.Ct. 3409, 3437, 73 L.Ed.2d 1215 (1982)). While the named plaintiffs have each alleged an individual claim of discrimination, these individual claims do not, without sufficient and supporting evidence, justify a determination that their claims are common within the class and typical of how the class members have been treated or impacted.

### 4. Adequacy of Representation

The adequacy of representation issue is of critical importance in all class actions and the court is under an obligation to pay careful attention to the Rule 23(a)(4) prerequisite in every case. *Vervaecke v. Chiles, Heider & Co., Inc.*, 578 F.2d 713, 719 (8th Cir.1978).

> Seeking to represent a large group of people as a class representative in a lawsuit is a very heavy responsibility. It should never be undertaken lightly, and the court should allow such representation only upon a firm foundation that the named plaintiffs are willing and [ ] able to shoulder that burden.

*Cervantes*, 1977 WL 89 at *3 (citing *Ralston v. Volkswagenwerk, A.G.*, 61 F.R.D. 427, 434 (W.D.Mo.1973)).

 Adequacy of representation focuses on two issues: (1) whether the representatives have common interests with class members; and, (2) whether the representatives will vigorously prosecute the interests of the class. *Paxton*, 688 F.2d at 562–63.[20] Where the class representative's individual claim lacks merit, that representative cannot be allowed to represent the interests of a class. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). A court is not permitted "to foist upon the class a representative who would not himself be a member of the class." *Vervaecke*, 578 F.2d at 720(citing *Walker v. World Tire Corp.*, 563 F.2d 918, 922 n. 4 (8th Cir.1977)). A the class representative that has not been a victim of discrimination cannot represent the class, (see, *Roby*, 775 F.2d at 962; *Walker*, 563 F.2d at 922), and a plaintiff has no standing to be named as a class representative unless he or she has filed an EEOC charge in accordance with the law. *Briggs*, 796 F.2d at 1018. Finally, where the interests of the named plaintiff conflicts with the interests of class members, that plaintiff is not an appropriate class representative. See, *Wakefield*, 120 F.R.D. at 117.

 Named plaintiff, Robert Clayborne, is the only exempt employee seeking to be named a class representative. He is therefore the only named plaintiff who could represent the class of exempt African American employees of OPPD. However, even though he works for OPPD in a management capacity, his claim is in direct conflict with other management employees within his purported class. Gloria Guillard and Rubin Carter are African Americans and members of OPPD's management in the human resources department. If included as members of the class of exempt employees, they will be required to defend their own conduct as it relates to the

---

**20.** Another factor in determining adequacy of representation is the capability, experience, or conflict of interest of the counsel who would represent the plaintiff class. *Wrighten v. Metropolitan Hospitals*, 726 F.2d 1346 (9th Cir.1984).

Although inadequate legal representation precludes a finding of adequate class representation, OPPD concedes that counsel for the putative class is competent, (defendant's brief at p. 50.), and I find no evidence to the contrary.

allegations of the class, and specifically Mr. Clayborne's allegations. Outside of the human resources department, there is no evidence of what level of management evaluates Mr. Clayborne's performance and his prospects for advancement, promotion and additional compensation. To the extent that any of these exempt employees are African American, they also cannot be members of the class because their interests, like that of the human resources management, are in conflict with Mr. Clayborne's. He therefore is not an adequate representative of all exempt African American employees of OPPD.[21]

■ Named plaintiff John smith cannot be a class representative. He has filed no EEOC charge of discrimination, and with the exception of an event that occurred more than three years before this suit was filed, he does not allege racial discrimination in promotion, compensation, performance evaluations, or training. The court therefore has no jurisdiction to hear any claim brought by or through him, and his claim lacks merit.

■ Named plaintiff Angela Sanders resigned from OPPD in July of 1999. Ms. Sanders testifies that she resigned because she felt her education was not being used and she was not advancing at OPPD. Exhibit 34, Sanders, 83:23–84:25. Her only claim within the appropriate limitations period is the alleged denial of promotion opportunities due to discrimination. Her primary claim for relief is compensatory damages in that she does not seek reinstatement. A named plaintiff who has not worked for OPPD for nearly three years and seeks compensatory damages on her own behalf is not an appropriate class representative in that her claims are not typical of the class.

This lapse of time implies two conditions: (1) a lack of familiarity with present practices of the employer, and (2) a waning interest in curing present or very recent practices that may be discriminatory as compared with condemnation of past practices that resulted in financial loss to the named plaintiffs. Necessarily, then, the court must be hesitant in permitting the rights of recent and present employees to be upheld or lost by ones with different interests.

*Cervantes*, 1977 WL 89, at *3.

■ Named plaintiff Shawn Moore remains employed with OPPD but while alleging discrimination in training, compensation, work assignments and promotions, admits that she was not denied training and was encouraged to take college courses. Her only claim of unequal pay relates to not obtaining a position in payroll in the early 1990s. She applied for a position in 2000 which was given to someone with an accounts payable and accounting background who had previously been a supervisor in the accounts payable department. Exhibit 37, Moore, 88:1–89:1, 92:15–93:25, 100:11–102:18, 111:7–12, 112:13–24. Although she may have an individual discrimination claim against OPPD, she has not shown that the treatment she received is typical of the alleged discrimination of class members in the area of promotion, compensation, performance evaluations, and training. Representatives must possess the same interest and suffer the same injury as the members of the class. *Caviness*, 1993 WL 330648 at *6 (plaintiff alleging discrimination in hiring and hostile work environment, and alleging that virtually all-male work force was perpetuated by allowing crews to hire by "word-of-mouth" could not represent those discriminated against in recruiting, promotion, or lateral transfers).

■ Named plaintiff Georgianna Brown also cannot assert claims typical of the class and an ability to adequately represent the class. Ms. Brown alleges discrimination in compensation and performance evaluations, the use of coercive tactics by the defendant during the performance evaluation process to obtain her acquiescence to unfair evaluations, the lack of merit pay increases, and racial discrimination in promotions and training opportunities. However, she testified concern-

---

**21.** Even if the class were limited to those whom he can adequately represent, (the definition of which cannot be made by the court on the information it has received), the number of members within that class is unknown. There is no showing that it would be impractical to join those members into the lawsuit to assert and represent their own interests if they so desired.

**599**

ing a work history that included significant and repeated absences due to illness which were the subject of her evaluations. These evaluations provided a basis for determining promotions. Her absenteeism far exceeded that of the population of class members she wishes to represent and will likely be an area OPPD will focus on in defending her claim and the claim she pursues on behalf of the class. Her circumstances and job history is not typical of the class and may weaken the strength of any action brought on behalf of its members. See, *Grant*, 548 F.Supp. 1189, 1193 (named plaintiff not a suitable representative where employer's substantial and individual defenses relating to plaintiff's poor job performance would detract from the common questions of law and fact relating to the class, and may well prejudice other members of the class).

Provided all other requirements for class certification have been met, named plaintiff Lelia Johnson could adequately represent the class of non-exempt African Americans. She alleges that in 2000, her application for promotion was rejected in favor of less qualified white secretaries, with less seniority, who received higher pay. She remains employed by OPPD, has filed an EEOC charge, and seeks not only compensatory damages, but back pay. If a class of non-exempt African Americans were to be certified, the evidence supports a finding that she has interests in common with those alleging discrimination in promotion, compensation, and the performance evaluations and training which can lead to opportunities in those areas, and that she is able to vigorously prosecute the interests of the class.

For the reasons discussed above, I conclude that there is no named plaintiff who could represent the interests of the class of exempt employees, and only named plaintiff Lelia Johnson could adequately represent the class of non-exempt employees.

### IV. Rule 23(b)

Class certification is not permitted unless the named plaintiffs can also prove that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The plaintiffs argue that this case can be properly certified under Rule 23(b)(2), a hybrid of Rule 23(b)(2) and Rule 23(b)(3), or under Rule 23(b)(3).

Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Class certification pursuant to Rule 23(b)(2) is appropriate when plaintiffs seek injunctive relief from acts of an employer on grounds generally applicable to the class. *Paxton*, 688 F.2d at 563. Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages." See Fed.R.Civ.P. 23(b)(2). "[N]onequitable monetary relief may be obtained in a class action certified under Rule 23(b)(2) only if the predominate relief sought is injunctive or declaratory." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 425 (5th Cir.1998).

Even if damages are requested, a class action under Rule 23(b)(2) may be maintained if the damages are merely incidental to a prayer for declaratory and injunctive relief. *Id.* See, *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir.1995) (citing *Paxton*, 688 F.2d at 563). The request for compensatory damages by the named plaintiffs in this action is, however, more than "incidental." Incidental damages are those that "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Allison*, 151 F.3d at 415. Such damages are not assessed based on the individual circumstances of the class representative's work history and personal injury, and do not "require additional hearings to resolve the disparate merits of each individuals's case." *Id.*

Each of the named plaintiffs has asserted an interest in recovering compensatory damages for loss of income and benefits, and for their pain, suffering, and emotional distress. (Filing 33, amended complaint ¶¶ 56, 60, 64,

68, 69, 72, 77, 81, 85, 89, 93, 97, 101, 105, 109, and Prayer for Relief, ¶ f; Exhibit 34, Sanders, 125:24–127:19; Exhibit 35, Johnson, 168:1–169:4; Exhibit 36, Brown, 208:3–209:16; Exhibit 37, Moore, 118:7–119:7). Calculating the earnings, wages, and other benefits plaintiffs and the class they represent would have received but for the discriminatory practices of defendant, (*Robinson,* 111 F.Supp.2d at 1126), and the compensatory damages these employees may be entitled to for pain, suffering and emotional distress, (*Morgan,* 169 F.R.D. at 358), will depend on an individualized analysis of each class member's circumstances. Such damages are not merely "incidental" to the claims of the class as a whole. I conclude therefore that they cannot be recovered by the class under Rule 23(b)(2), and thus that certification under Rule 23(b)(2) is not appropriate in this case.

 I also conclude that certification under Rule 23(b)(3) is inappropriate. To proceed with any portion of this case under Rule 23(b)(3), the plaintiff must prove that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The evidence in support of this action, as reflected in the employee affidavits and the depositions of the named plaintiffs, reflects highly individualized claims of discriminatory conduct. There is no sufficient showing of a pattern or practice of discriminatory treatment, or of discriminatory impact arising from OPPD's policies or practices. As such, questions of law and fact common to the class are not predominant. Rather, the defendant's liability to an individual employee member of the class for damages, and a determination of the amount of damages owed, depends on that employee's circumstances and is subject to any defense the company may have.

Questions affecting individual class members, such as how they were discriminated against and how it affected them individu-

ally, involve not merely separate issues concerning damages, but differences in whether individual members can prove their claims. Under such circumstances, the common issues concerning a defendant's pattern or practice of discrimination will not always predominate over the individual, case-specific questions relevant to each plaintiff's claim, nor will the class mechanism envisioned by Rule 23(b)(3) readily constitute a superior method of adjudication.

*Reid,* 205 F.R.D. at 684. (internal citations omitted).

The facts that have been developed and presented on plaintiffs' motion for class certification do not provide sufficient proof of a policy or practice of discrimination suitable for injunctive and declaratory relief under Rule 23(b)(2). Individual claims of alleged discrimination are the focus of this lawsuit, with no sufficient evidence to bridge the gap between plaintiffs' claims and a claim that the class, as a whole, has been subject to similar treatment. The named plaintiffs have failed to prove that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and certification under Rule 23(b)(3) alone, or as a hybrid with Rule 23(b)(2) is not appropriate.[22]

There being insufficient evidence to support the prerequisites for class certification under Rule 23, and no showing that the resources of both the courts and the parties will be better and more efficiently used as a result of certification, I conclude that plaintiffs' motion for class certification should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) that the "Plaintiffs' Motion for Class Certification," filing 45, be denied in all respects.

**22.** The plaintiff's reliance on *EEOC v. Nebco Evans Distribution, Inc.,* 1997 WL 416423 (D.Neb. 1997) (Strom, J.) and *Taylor v. District of Columbia Water & Sewer Authority,* 205 F.R.D. 43, 46 (D.D.C.2002), is misplaced, as neither of those cases obviates the requirement that the class claims must "predominate." See, *Cooper,* 467 U.S. 867, 876, 104 S.Ct. 2794 (judgment in class action, which determined that employer did not engage in general pattern or practice of racial discrimination against certified class of employees, did not preclude class members from maintaining subsequent civil actions alleging individual claims of racial discrimination against employer.).

The parties are notified that a failure to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

FURTHER, IT HEREBY IS ORDERED: Plaintiffs' "Motion for Oral Argument on Motion for Class Certification," filing 51, is denied.

Dated this 14th day of June, 2002.